1

2

3

4

5                      **UNITED STATES DISTRICT COURT**
                           **DISTRICT OF NEVADA**
6                            **RENO, NEVADA**

7
SHUFFLE MASTER, INC.,            )        3:04-CV-0407-ECR-RAM
8                               )
                                )
9  Plaintiff,                    )
                                )        **ORDER**
10 vs.                           )
                                )
11 MP GAMES, LLC D/B/A MINDPLAY  )
   GAMES, ROBERT MOUCHOU,        )
12 ALLIANCE GAMING CORP. D/B/A    )
   BALLY GAMING AND SYSTEMS      )
13 and                           )
   BALLY GAMING, INC.,           )
14                               )
                                )
15 Defendants.                   )
   _____)
16

17

18

19 **I.   Procedural Background**

20      On October 22, 2004, Plaintiff Shuffle Master ("Plaintiff" or

21 "Shuffle Master") filed an amended complaint (#42) against

22 Defendants Bally, Mindplay and Robert Mouchou ("Defendants" or

23 "Bally")[1] alleging patent infringement and trade secret

24 misappropriation.  In particular, Plaintiff alleged that

25 Defendants' MP 21 System infringed on their patent, U.S. Patent No.

26 ─────────────────────────

27      [1]We note that although Defendants were referred to in the
   briefings as "Mindplay," the parties now choose to refer to Defendants
28 as "Bally" due to Bally's role in developing and marketing the
   allegedly infringing MP 21 System.

1  6,313,871 or the "'871", for which Oliver Schubert is the named

2  inventor.  Plaintiff also claimed that the MP 21 System was

3  invented through misappropriation of Plaintiff's trade secrets.

4  Defendants then brought a counterclaim (#45) on October 28, 2004,

5  against Plaintiff alleging that Shuffle Master misappropriated

6  Defendants' trade secrets after viewing a demonstration of the MP

7  21 System while under a non-disclosure agreement.

8       On January 27, 2005, the parties entered into a stipulation

9  for a Markman hearing for claim construction of contested terms of

10 Plaintiff's and Defendants' patents (#125).

11      Plaintiff filed an opening claim construction brief (#137) on

12 February 25, 2005.  Defendants responded to Plaintiff's opening

13 brief (#164) on March 25, 2005 and Plaintiff filed a reply (#197)

14 on April 11, 2005.

15      Defendants filed an opening claim construction brief (#140) on

16 February 25, 2005.  Plaintiff responded to Defendants' opening

17 claim construction brief (#168) on March 25, 2005 and Defendants

18 filed a reply (#187) on April 11, 2005.

19

20 **II.   Factual Background**

21      This litigation stems from both Defendants' and Plaintiff's

22 patents which are used to survey gaming tables of casinos in

23 monitoring game play and betting.

24      Before the invention of the current technology involved in

25 this litigation, humans walking around casinos or video cameras or

26 humans surveying from above were used to monitor gaming activity in

27 casinos.  ('871, Description of Related Art, 1:24-47).  The

28                              2

automatic systems which use video cameras and computer programs to monitor play activity have reduced labor costs as well as the number of errors that human monitors used to make in surveying gaming tables.  The technology described in this litigation is part of comprehensive systems for monitoring game play and analyzing betting on a gaming table.  Both Defendants' and Plaintiff's technology concern collecting data on chips and other betting activities to analyze and monitor game play.

Bally and Shuffle Master are competitors in the business of game monitoring systems.  These systems are used in casinos all over the United States and are employed in all types of casino games including blackjack, roulette, craps, and wheel of fortune.

Bally and Shuffle Master vary widely in their account of the facts leading to this litigation.

The Plaintiff Shuffle Master begins with the '871 patent's (entitled "Apparatus and Method for Monitoring Gambling Chips") filing on February 19, 1999.  The patent was issued on November 20, 2002.  The '871 was reduced to practice no later than 1996. Shuffle Master purchased the patent from Oliver Schubert in August 2002.

Plaintiff claims that its trade secrets were disclosed in July 1997 during a prototype demonstration given by Richard Schubert to Robert Mouchou and Gene Carano, who were at that time executives of the El Dorado Hotel and Casino.  The meeting between Schubert, Moucho and Carano was part of a round of discussions to start a joint venture between Schubert and the El Dorado to create a fully integrated game table monitoring system.  As part of these

1   discussions, the El Dorado had tentatively agreed to purchase the

2   invention which was the subject of the '871 patent as well as the

3   chip recognition system ('647 patent) owned by Schubert.  The

4   agreement papers, Schubert claims, were sent to Mouchou and

5   included the trade secrets of the invention.

6       Plaintiff claims that instead of striking a deal with

7   Schubert, Mouchou disclosed the trade secrets given to him by

8   Schubert to Mindplay which then created the MP 21 System.

9       Defendants have a different version of the history of this

10  litigation.  MP Games LLC ("Mindplay") is a limited liability

11  company which was founded by Richard Soltys, Richard Huizinga and

12  Creed Jones in 1998.  Mindplay's assets were purchased by Alliance

13  Gaming Corporation in early 2004.  Bally, a subsidiary of Alliance

14  Gaming, is currently marketing the MP 21 System which incorporates

15  the Mindplay patents.  Soltys and Huizinga began in 1998 developing

16  and marketing a new technology that monitors play on a blackjack

17  table.  Soltys and Huizinga obtained patents for the technology in

18  2001, including the eight patents in question in this litigation.

19      In 2001, Shuffle Master inquired about Mindplay's proprietary

20  technology when the MP 21 System was still in development.

21  Defendants claim that following a demonstration by Mindplay,

22  Shuffle Master approached Schubert desiring to create the same

23  system for automatic game table monitoring.  Schubert assisted in

24  the development of SmartTable, a rival product of the MP 21 System,

25  which Shuffle Master demonstrated at the Global Gaming Expo in Las

26  Vegas in 2003.  After this demonstration, Shuffle Master approached

27  Mindplay about licensing Mindplay's patents for game table

28                                  4

1  monitoring.   When Mindplay refused, Bally argues, Shuffle Master

2  filed this suit.

3  **III.   Applicable Law**

4       There are two steps to a patent infringement case.   <u>Cybor</u>

5  <u>Corp. v. FAS Techs., Inc.</u>, 138 F.3d 1448, 1454 (Fed. Cir. 1998)(en

6  banc).   First, the court must engage in "claim construction": the

7  defining of the meaning and scope of the claims of the patent.

8  <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 384 (1996).

9  Second, infringement is determined by comparing the accused device

10 to the properly construed claims.   <u>Cybor Corp.</u>, 138 F.3d at 1454.

11 While claim construction is a question of law for the court, the

12 second step of infringement analysis is a question of fact for the

13 fact finder.   <u>See</u> <u>N. Am. Container, Inc. v. Plastipak Packaging,</u>

14 <u>Inc.</u>, 415 F.3d 1335, 1344 (Fed. Cir. 2005).

15      Plaintiff and Defendants in this case have asked the court to

16 engage in claim construction concerning patents of both Plaintiff,

17 '871 and '647, and Defendants, '436, '857, '271, '836, '837, '180,

18 '181, '696.

19      Although construing a patent is much like construing a statute

20 or contract, there are several important differences.   Recently,

21 the Federal Circuit clarified the principles and evidence

22 (intrinsic and extrinsic) which district courts are to use in

23 engaging in claim construction.   <u>See</u> <u>Phillips v. AWH Corp.</u>, 415

24 F.3d 1303 (Fed. Cir. 2005).   There were several important

25 principles that emerged from this case that will be discussed below

26 in order to instruct our claim construction process.

27

28                                      5

**A.   Intrinsic Evidence**

First, <u>Phillips</u> emphasized that the *primary* sources for guidance in claim construction are the intrinsic sources: claim language, written description of the specification (including drawings and figures), as well as the prosecution history.  <u>Id.</u> at 1312; <u>Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.</u>, 206 F.3d 1408, 1414 (Fed. Cir. 2000); <u>see also</u> <u>Teleflex, Inc. v. Ficosa N. Am. Corp.</u>, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002)("the intrinsic evidence may provide context and clarification about the meaning of the claim terms"); <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996)("intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language").  These elements consist of the "public record" of the patent and are therefore more capable of putting the public on notice of what is protected by the patent.  <u>See</u> <u>Markman</u>, 517 U.S., at 373.  The importance of each of these intrinsic sources descends from the claim language, to the specifications, to the prosecution history.  <u>Phillips</u>, 415 F.3d at 1312.

**1.   Claim Language**

Examination of the claim language is the first matter for the court in construing claim terms from a patent.  <u>Telefex</u>, 299 F.3d at 1324.  The court is required to search for the "ordinary and customary" meaning of the term or "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  <u>Phillips</u>, 415 F.3d at 1303.  However the

1 | ordinary meaning of the term is not taken in isolation.  The

2 | ordinary meaning of the term cannot be discerned without

3 | examination of the context in which the term is used in the

4 | contested claims as well as in other relevant claims as claim terms

5 | are normally used consistently throughout the patent.  Id., at

6 | 1314-15.

7 |

8 | **2.   Written Description and Drawings of the Specification**

9 | The written description and drawings of the specification are

10 | especially important in the construction of the claims due to the

11 | fact that the specifications are required by patent law to be "a

12 | sort of dictionary which explains the invention and may define

13 | terms used in the claims." Markman v. Westview Instruments, Inc.,

14 | 52 F.3d 967, 979-80 (Fed. Cir. 1995).

15 | Specifications are used in very explicit ways in claim

16 | construction.  First, the specifications can be used to modify an

17 | ordinary meaning when the patentee has given the term a special

18 | meaning in the specifications.  Phillips, 415 F.3d, at 1313.  Such

19 | special meaning need not be expressly stated.  Indeed, "when a

20 | patentee uses a claim term throughout the entire patent

21 | specification in a manner consistent with only one single meaning,

22 | he has defined that term by implication." Bell Atlantic Networks

23 | Servs., Inc. v. Covad Communications Group, Inc., 262 F.3d 1258,

24 | 1271 (Fed. Cir. 2001).

25 | Second, when there is no ordinary meaning that can be

26 | discerned from the claim itself, the specifications should be

27 |

28 |

7

1 consulted to determine definite meaning.  CCS Fitness, Inc. v.

2 Brunswick Corp., 288 F.3d 1359, 1367 (Fed. Cir. 2002).

3         Third, a patentee might disavow a meaning in the

4 specifications that should be eliminated from the claim

5 construction.  Teleflex, 299 F.3d at 1325-27.  Finally, the

6 construing court may deviate from the ordinary meaning if there are

7 terms in the specifications that can be seen as important that

8 change the ordinary meaning discerned from the claim terms.  Toro

9 Co. v. White Consol. Indus., 199 F.3d 1295, 1301 (Fed. Cir. 1999).

10        Specifications should never be used to limit the scope of a

11 claim but only to enlarge it.  Teleflex, 299 F.3d at 1326.  Because

12 preferred embodiments are usually discussed in the specifications,

13 such embodiments are not exclusive for purposes of claim

14 construction.  Id.

15

16 **3.  Prosecution History**

17        The Phillips court also specified that the prosecution

18 history, if any, is also highly relevant to claim construction.

19 Phillips, 415 F.3d at 1317.  Prosecution history is useful because,

20 like the specifications, it was "created by the patentee in

21 attempting to explain and obtain the patent."  Id.  Prosecution

22 history can change the meaning of the claims in two ways: either

23 the patentee discloses a preferred meaning of the terms or he

24 disclaims a meaning of the terms.  Id.  However, the Phillips court

25 cautioned that because the prosecution history involves negotiation

26 between the patentee and the Patent and Trademark Office ("PTO"),

27 the prosecution history lacks clarity and finality.  Id. at 1318.

28

1  Therefore, the prosecution history is less important than the

2  specifications and claim language in claim construction.  <u>Id.</u>.

3

4  **B.   Extrinsic Evidence**

5      If after having analyzed all the intrinsic evidence, the claim

6  terms remain ambiguous, the court may turn to extrinsic evidence in

7  resolving the ambiguity.  <u>Phillips</u>, 415 F.3d at 1318.  However,

8  extrinsic evidence is less reliable than the patent and its

9  prosecution history and consulting such sources should be avoided.

10  <u>Id</u>.

11     The court in <u>Phillips</u> authorized the use of technical

12  dictionaries and treatises in aiding in determining the meaning of

13  particular terminology used by those skilled in the art.  <u>Id</u>.  In

14  addition, the court stated that expert witnesses could be helpful

15  in providing background on the technology at issue, in

16  understanding technical aspects of the field of invention as well

17  as the invention itself, and in explaining a particular meaning

18  that a term has in the particular field relevant to the patent.

19  <u>Id.</u>

20

21     **IT IS HEREBY ORDERED** that the claims presented for

22  construction in Plaintiff's Opening Claim Construction (#137) and

23  in Defendants' Joint Opening Claim Construction (#140) are

24  construed as set forth in Exhibit A attached hereto.

25          This 20th day of December, 2005.

26

27  _____
   UNITED STATES DISTRICT JUDGE

28                    9