1

2                   **UNITED STATES DISTRICT COURT**

3                        **DISTRICT OF NEVADA**

4

5

6   SHUFFLE MASTER, INC., and      )
    IGT,                           )        3:04-CV-00407-ECR (RAM)
7                                  )
                Plaintiffs,        )
8                                  )
          v.                       )        **ORDER**
9                                  )
    MP GAMES LLC D/B/A MINDPLAY    )
10  GAMES, ROBERT MOUCHOU,         )
    ALLIANCE GAMING CORP. D/B/A    )
11  BALLY GAMING AND SYSTEMS and   )
    and BALLY GAMING, INC.,        )
12                                 )
                Defendants.        )
13  _____ )

14       Plaintiffs Shuffle Master, Inc., and International Game

15  Technology ("IGT", collectively "Plaintiffs") originally sued

16  Defendants MP Games, Robert Mouchou, Alliance Gaming Corp., and

17  Bally Gaming Inc. (collectively "Defendants"), claiming that

18  Defendants' MP21 game system infringed several patents held by

19  Shuffle Master.  (Complaint (#1).)  Plaintiffs' First Amended

20  Complaint (#42) alleges eleven causes of action, respectively for:

21  (1) infringement of U.S. Patent 6,313,871 ('871); (2) infringement

22  of U.S. Patent 5,781,647 ('647); (3) correction of the named

23  inventor of U.S. Patent 6,517,436 ('436); (4) correction of the

24  named inventor of U.S. Patent 6,520,857 ('857); (5) correction of

25  the named inventor of U.S. Patent 6,527,271 ('271); (6) correction

26  of the named inventor of U.S. Patent 6,530,836 ('836); (7)

27  correction of the named inventor of U.S. Patent 6,712,696 ('696);

28  (8) correction of the named inventor of U.S. Patent 6,579,180

                                    1

1  ('180); (9) correction of the named inventor of U.S. Patent

2  6,579,181 ('181); (10) misappropriation of trade secrets; and (11)

3  a finding that this is an exceptional case pursuant to 35 U.S.C.

4  § 285.

5      Defendants counter-claimed against Shuffle Master for

6  infringement of several MindPlay patents by Shuffle Master's

7  SmartTable game monitoring system and for misappropriation of trade

8  secrets.  The counterclaims alleged in their Answer (#45) to the

9  amended complaint are respectively for: (1) a declaratory judgment

10  that the '871 patent is invalid and not infringed; (2) a

11  declaratory judgment that the '647 patent is invalid and not

12  infringed; (3) misappropriation of trade secrets; (4) breach of

13  contract; (5) infringement of the '436 patent; (6) infringement of

14  the '857 patent; (7) infringement of the '836 patent; and (8)

15  infringement of the 6,530,837 patent.  In turn, Plaintiffs then

16  counter-claimed, alleging that three patents owned by MindPlay

17  ('436, '857, and '836) interfere with the '871 patent, and that

18  these patents, as well as U.S. Patent No. '837 patent, are invalid

19  in light of prior art.  (P.s' Fourth Amended Reply to D.s'

20  Counterclaims to First Amended Complaint for Patent Infringement

21  and Affirmative Defenses and Counterclaims in Reply Thereto

22  (#556).)

23      The Court dismissed (#207) without prejudice Defendants'

24  breach of contract claim (count IV (#45)) on April 19, 2005.  The

25  parties then stipulated to the dismissal (#565) of the

26  misappropriation of trade secrets claims on October 2, 2006.

27      The Court entered its Order (#322) construing the disputed

28

1    claim terms in the '647 and '871 patents on December 20, 2005.

2    The dispositive motions currently pending before the Court are:

3    1.    Defendants' Motion for Summary Judgment of Non-Infringement
           and Invalidity 5,781,647 (#580, #742);
4
5    2.    Defendants' Motion for Summary Judgment of Non-Infringement
           and Invalidity of U.S. Patent No. 6,313,871 (#566, #743);

6    3.    Defendants' Motion for Summary Judgment of Invalidity of U.S.
           Patent No. 6,313,871 Due to Failure to Join Co-Inventor
7          William Florschuetz (#575);

8    4.    Plaintiffs' Cross Motion for Summary Judgment (set forth in
           Plaintiffs' Opposition to Defendants' [Seventh] Motion for
9          Summary Judgment of Invalidity of U.S. Patent No. 6,313,871
           Due to Failure to Joint Co-Inventor William Florschuetz
10         (#672);

11   5.    Defendants' Motion for Summary Judgment on Shuffle Master's
           Claim for Correction of Inventorship in Counts III through IX
12         of the First Amended Complaint (#578).

13   6.    Plaintiff Shuffle Master's Motion for Summary Judgment of
           Invalidity of the Asserted Claims of U.S. Patent Nos.
14         6,517,436 and 6,520,857 (#577); and

15   7.    Defendants' Motion for Summary Judgment of Plaintiffs' Counts
           I-III of Counterclaims for Interference (#572).
16
17   Each motion has been fully briefed, and following the Supreme

     Court's decision in KSR Int'l Co. v. Teleflex Inc., 127 S.Ct. 1727
18
     (2007), the Court allowed for additional briefing regarding the
19
     effects of KSR on the pending dispositive motions.  (Order of June
20
     14, 2007 (#817).)  The Court heard oral argument on the pending
21
     motions on February 28 and 29, 2008.
22
23        Defendants have filed the following motions to strike and

24   evidentiary objections:

25   1.    Objection (#767) to the Declaration of Jared E. Hedman in
           Support of Plaintiffs' Motion for Summary Judgment of
26         Invalidity of U.S. Patents 5,781,647 and 6,313,871;

27

28

2.  Objection (#766) to the Declaration of Christopher M. Kaiser in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment of Invalidity of U.S. Patent No. 6, 313,871 Due to Failure to Join Co-Inventor William Florschuetz;

3.  Objection (#765) to the Declaration of Michael P. Bregenzer in Support of Shuffle Master's Opposition to Defendants' Motions for Summary Judgment of Non-Infringement of U.S. Patent No. 6,313,871;

4.  Objection (#764) to the Declaration of Christopher M. Kaiser in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on Shuffle Master's Claim for Correction of Inventorship in Counts III through IX of the First Amended Complaint (#764);

5.  Objection (#763) to the Declaration of Michael P. Bregenzer in Support of Shuffle Master's Motion for Summary Judgment of Invalidity of the Asserted Claims of the U.S. Patent Nos. 6,517,436 and 6,529,857 (#763);

6.  Objection (#761) to the Declaration of John Strisower in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment of Invalidity of U.S. Patent Nos. 5,781,647 and 6,313,871 (#761);

7.  Objection (#760) to the Declaration of Jared E. Hedman In Support of Shuffle Master's Motion for Summary Judgment of Invalidity of the Asserted Claims of U.S. Patent Nos. 6,517,436 and 6,529,857;

8.  Objection (#759) to the Declaration of Dr. Kenneth Castleman in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment of Non-Infringement of U.S. Patents Nos. 5,781,647 and 6,313,871;

9.  Objection (#758) to the Declaration of Oliver Schubert in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment on Shuffle Master's Claim for Corrections of Inventorship in Counts III through IX of the First Amended Complaint;

10. Objection (#756) to the Declaration of James T. Carmichael in Support of Plaintiffs' Memoranda in Opposition to Defendants' Eighth Motion for Summary Judgment of Plaintiffs' Counts I-III of Counterclaims for Interference and Defendants' Ninth Motion for Summary Judgment on Shuffle Master's Claim for Correction of Inventorship in Counts III-IX of the First Amended Complaint (#756);

4

11.   Objection (#748) to the Declarations of Oliver Schubert and Willy Florschuetz in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment of Invalidity of U.S. Patent No. 6,313,871 for Failure to Join Co-Inventor Willy Florschuetz;

12.   Defendants' Motion (#824) to Strike the Supplemental Expert Report of James T. Carmichael and the Portions of the Supplemental Expert Report of John Strisower Addressing Plaintiffs' Interference Claim for Violation of the Court's June 14, 2007 Order.

Plaintiffs have filed the following evidentiary objections and motions to strike:

13.   Plaintiffs' Objections to Defendants' Summary Judgment Declarations (#802);

14.   Plaintiffs' Motion to Strike [886] Errata (#891);

15.   Plaintiffs' Motion for Leave to File Shuffle Masters Motion For Leave To File Responses To Defendants Supplemental Statements Of Undisputed Facts In Support Of Defendants Motions for Summary Judgment of Non-Infringement and (#885).

**I.   Evidentiary and Procedural Objections**

The Court's rulings on the evidentiary objections and motions to strike are as follows:

1.   Plaintiffs' Motion to Strike [886] Errata (#891) and Plaintiffs' Motion for Leave to File Responses (#885) are **DENIED**. The Motion to Strike is meritless and the Motion for Leave to File Responses is effectively a motion for reconsideration that the Court will deny for the reasons already stated.

2.   Defendants' Motion (#824) to Strike the Supplemental Expert Report of James T. Carmichael and the Portions of the Supplemental Expert Report of John Strisower Addressing Plaintiffs' Interference Claim for Violation of the Court's June 14, 2007 Order is **DENIED** as to Strisower but **GRANTED** as to Carmichael.  The "evidence" submitted by Carmichael is improper and irrelevant in

5

1 | this case.

2 |     Although Carmichael was educated as both an attorney and an

3 | engineer, the opinions he offers are legal conclusions that stem

4 | from his experience working at the United States Patent and

5 | Trademark Office (PTO).  Plaintiffs are entirely correct that

6 | Carmichael's legal opinions cannot properly be considered as

7 | factual evidence in this case.  See, e.g., Endress + Hauser, Inc.

8 | v. Hawk Measurement Systems Pty. Ltd., 122 F.3d 1040, 1042 (Fed.

9 | Cir. 1997) ("this court has on numerous occasions noted the

10 | impropriety of patent lawyers testifying as expert witnesses and

11 | giving their opinion regarding the proper interpretation of a claim

12 | as a matter of law"); Aguilar v. International Longshoremen's Union

13 | Local No. 10, 966 F.2d 443, 447 (9th Cir. 1992) (striking expert

14 | testimony regarding legal issues of reasonableness and

15 | foreseeability is entirely appropriate); see also Becton Dickinson

16 | and Co. v. C.R. Bard, Inc., 922 F.2d 792, 797 (Fed. Cir. 1990)

17 | (witness's legal opinion is "not fact evidence," and thus is

18 | insufficient to create genuine issue of material fact).  This Court

19 | disagrees with the reasoning stated in Talarico v. Marathon Shoe

20 | Compnay, 182 F.Supp.2d 102, 112-13 (D. Me. 2002), which essentially

21 | held that the relevance issue can be avoided to the extent that the

22 | attorney's expert opinion helps "articulate" the party's case.  Id.

23 | at 112-13; see also Reiffin v. Microsoft Corp., 270 F.Supp.2d 1132,

24 | 1145 (N.D. Cal. 2003) (citing with approval Talarico and allowing

25 | patent attorney's explanation where an allegation of laches

26 | apparently made the reasonableness of the patent prosecution

27 | relevant).  Sidestepping the relevance issue allows a party to

28 | retain and present the argument of outside counsel as expert

1   factual evidence.  This is impermissible both under Federal Rule of
2   Evidence 702 and under the rules of professional conduct.  See Nev.
3   R. Prof. Conduct 3.7 (adopting model rule 3.7, which states with
4   exceptions not relevant here that: "[a] lawyer shall not act as
5   advocate at a trial in which the lawyer is likely to be a necessary
6   witness").  Similarly, Carmichael's opinion regarding the likely
7   subjective thoughts of the patent examiner in light of PTO
8   procedures is irrelevant.  Both the record and the PTO procedures
9   speak for themselves.  In sum, Carmichael's opinions cannot be
10  considered in this case.

11       Accordingly, the objection (#756) to the Declaration of James
12  T. Carmichael in Support of Plaintiffs' Memoranda in Opposition to
13  Defendants' Eighth Motion for Summary Judgment of Plaintiffs'
14  Counts I-III of Counterclaims for Interference and Defendants'
15  Ninth Motion for Summary Judgment on Shuffle Master's Claim for
16  Correction of Inventorship in Counts III-IX of the First Amended
17  Complaint (#756) is **SUSTAINED**.  Defendants' objection (#760) to the
18  Declaration of Jared E. Hedman In Support of Shuffle Master's
19  Motion for Summary Judgment of Invalidity of the Asserted Claims of
20  U.S. Patent Nos. 6,517,436 and 6,529,857 is also **SUSTAINED** as to
21  Carmichael's report.

22       It does not follow that demonstrative evidence, including
23  Plaintiffs and Defendants' claim charts, would not be admissible at
24  trial.  See, e.g., Tritek Technologies, Inc. v. United States, 67
25  Fed. Cl. 727, 729 (2005) (demonstrative evidence used to explain or
26  illustrate other evidence that is already in the record may be
27  admissible).  On this basis, Plaintiffs' objection (#572) to
28  Defendants' claim charts is **OVERRULED**.  Although Plaintiffs' claim

charts (Exs. 7-14 to Carmichael Decl. (#683)) have been submitted to the Court on an improper basis, they will also be considered as demonstrative evidence.

3.   Defendants raise numerous objections (##767, 766, 765, 764, 763, 760) to the authentication of Plaintiffs' exhibits. Ninth Circuit law is clear that a document cannot be authenticated merely by way of an attorney's declaration that states that the document is "true and correct."  Beyene v. Coleman Sec. Services, Inc., 854 F.2d 1179, 1182 (9th Cir. 1988).  Further, it is generally the case that "to be considered by the court, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence."  Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896 F.2d 1542, 1550-51 (9th Cir. 1990) (emphasis supplied; internal quotations and brackets omitted); see generally Wright, Miller, & Kane, Federal Practice & Procedure: Civil 3d § 2722 (1998).  On the other hand, documents that are produced in discovery by a party opponent are, at least in many if not most cases, considered authentic if there is some indication that the documents are what they say they are and there is no substantive challenge to their authenticity.  See Maljack Productions, Inc. v. GoodTimes Home Video Corp., 81 F.3d 881, 889 n.12 (9th Cir. 1996) ("The district court did not err in considering the documents . . . [where (1) the appellant] produced the documents to [the appellee], [(2)] many of the documents were on . . . letterhead and [(3) the appellant] does not contest their authenticity.") (modifications supplied).  Accord McQueeney v. Wilmington Trust Co., 779 F.2d 916, 928-29 (3d Cir. 1985)

8

1  (production of documents in discovery is circumstantial evidence of
2  the documents' authenticity); <u>United States v. Brown</u>, 688 F.2d
3  1112, 1116 (7th Cir. 1982) (same).  Here, no substantive doubt has
4  been raised that any of the exhibits are authentic, and the
5  circumstantial evidence in each case suggests that the documents
6  are in fact authentic.  Most of the documents contain insignias,
7  logos, and letterheads, and the electronic mails appear to be
8  internally authenticating.  Having reviewed the evidence, and
9  absent a more substantive challenge, the exhibits shall be
10 considered authenticated.  Accordingly, the objections (##767, 766,
11 765, 764, 763, 760) to the authentication of these documents are
12 **<u>OVERRULED</u>**.

13      4.  Both Plaintiffs and Defendants object to expert reports
14 that have been submitted unsworn.  (##765, 760, 802.)  The Court
15 notes that the substance of the experts' findings has for the most
16 part been incorporated into sworn declarations, and it is hard to
17 see how this issue as anything but a waste of the Court's time.
18 Nevertheless, the purpose of allowing affidavits or declarations at
19 summary judgment is to consider testimony that would be admissible
20 at trial.  To be admissible, the testimony must be sworn.  <u>See</u> Fed.
21 R. Civ. P. 56(e); Fed. R. Evid. 603.  Indeed, papers referred to by
22 the affiant must also be "sworn or certified."  Fed. R. Evid.
23 56(e).  It clearly follows, and is well established, that an
24 unsworn expert report is inadmissible.  <u>See</u> <u>Wittmer v. Peters</u>, 87
25 F.3d 916, 917 (7th Cir. 1996) (unsworn expert reports are not
26 admissible under Rule 56(e) to support or oppose summary judgment);
27 <u>Fowle v. C & C Cola</u>, 868 F.2d 59, 67 (3d Cir. 1989) (expert's
28 report attached to the declaration of plaintiff's counsel does not

comply with Rule 56(e), since "[t]he substance of th[e] report was not sworn to by the alleged expert"); <u>Provident Life and Accident Ins. Co. v. Goel</u>, 274 F.3d 984, 1000 (5th Cir. 2001) ("'Unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment.'") (quoting 11 Moore's Federal Practice ¶ 56.41[2][c] (3d ed. 1997)).  <u>See also</u> <u>EPIS, Inc. v. Fidelity and Guaranty Life Ins. Co.</u>, 156 F.Supp.2d 1116, 1124 (N.D. Cal. 2001) (striking declarations for numerous reasons, including because they were unsworn).[1]  Some courts have held parties opposing summary judgment to a "less exacting" standard than parties seeking summary judgment, so long as the requirements of Rule 56(e) — that is, personal knowledge, competence, and admissibility — are met.  <u>See Competitive Technologies, Inc. v. Fujitsu Ltd.</u>, 333 F.Supp.2d 858, 863 (N.D. Cal. 2004).  Insofar as admissibility is actually required by these courts, Federal Rule of Evidence 603 presents a problem.  Further, insofar as summary judgment is an important component of the federal rules that is not disfavored, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986), we do not see the purpose or the fairness in applying different, and somewhat fuzzy rules of evidence to the parties at summary judgment.  The objections (##765, 760, 802) to the unsworn reports are **SUSTAINED**.

 5.  Defendants' objections (##759, 761) to the declarations of

---

[1]It has generally been held that the problem may be remedied after it is identified.  <u>See Maytag Corp. v. Electrolux Home Products, Inc.</u>, 448 F.Supp.2d 1034, 1046 (N.D. Iowa 2006) (collecting cases).

1  John Strisower and Dr. Kenneth Castleman in light of the Court's

2  claim construction are **OVERRULED**.  Defendants have a point.  <u>See</u>

3  <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en

4  banc) ("a court should discount any expert testimony 'that is

5  clearly at odds with the claim construction mandated by the claims

6  themselves, the written description, and the prosecution history,

7  in other words, with the written record of the patent.'").  Under

8  the circumstances, however, and even to the extent that Defendants'

9  arguments have some merit in each case, these arguments appear to

10  go to weight rather than admissibility.

11      6.  Plaintiffs' objection (#802) to the Declaration of Glenn

12  Fishbine, dated October 3, 2006 (#571), is **SUSTAINED**.  There may be

13  some overlap in the areas that the Magistrate Judge designated as

14  permissible and impermissible areas of testimony for Glenn

15  Fishbine.  However, should Defendants wish to rely on Fishbine's

16  testimony in any further proceedings, they should move for

17  clarification rather than submitting testimony that is very clearly

18  at odds with an order (#518) of the Magistrate Judge.

19      7.  Defendants' hearsay objection (#766) regarding Willy

20  Florschuetz's statements as relayed by Oliver Schubert — stating

21  that Florschuetz stated "I wasn't really a part of that" and "No, I

22  don't think I need to be named as an inventor" — is **SUSTAINED**.

23      8.  Defendants' hearsay objections (##760, 767) regarding

24  Douglas Anderson's statements regarding Bryant Scheffe's role in

25  the development of Trak-21 are **OVERRULED**.

26      9.  Defendants' objection (#765) to the testimony of Dan

27  Tylutki asserting lack of foundation is **OVERRULED**.

28      10. The redacted versions of the translated emails between

11

Schubert and Florschuetz were before the PTO, and thus were readily available to Defendants.  The actual substance of the translations has not been disputed.  The apparent failure to initially produce the translations of the German emails between Schubert and Florschuetz and the apparent failure to produce information regarding the circumstances of their translation appears to the Court to have been substantially harmless, but the Court will consider a motion to recover any expenses incurred by Defendants in verifying the translations.  <u>Cf.</u> Fed. R. Evid. 604.  On this basis, Defendants' objection (#763) to the Declaration of Michael P. Bregenzer in Support of Shuffle Master's Motion for Summary Judgment of Invalidity of the Asserted Claims of the U.S. Patent Nos. 6,517,436 and 6,529,857 is **<u>OVERRULED</u>**.

11. The parties' respective objections (#760, 802) to the scope of the deposition questioning of their own expert witnesses are **<u>OVERRULED</u>**.  The objections (##748, 758, 802) to the declarations of Huizinga, Soltys, Schubert, and Florschuetz are also **<u>OVERRULED</u>**.

## II.   Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists.  <u>Northwest Motorcycle Ass'n v. United States Dep't of Agric.</u>, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, <u>Bagdadi v. Nazar</u>, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment

as a matter of law.  Fed. R. Civ. P. 56(c).  Judgment as a matter
of law is appropriate where there is no legally sufficient
evidentiary basis for a reasonable jury to find for the nonmoving
party.  Fed. R. Civ. P. 50(a).  Where reasonable minds could differ
on the material facts at issue, however, summary judgment should
not be granted.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th
Cir. 1995), cert. denied, 116 S.Ct. 1261 (1996).

The moving party bears the burden of informing the court of
the basis for its motion, together with evidence demonstrating the
absence of any genuine issue of material fact.  Celotex Corp., 477
U.S. at 323.  Once the moving party has met its burden, the party
opposing the motion may not rest upon mere allegations or denials
in the pleadings, but must set forth specific facts showing that
there exists a genuine issue for trial.  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986).  Although the parties may submit
evidence in an inadmissible form - namely, depositions, admissions,
interrogatory answers, and affidavits - only evidence which might
be admissible at trial may be considered by a trial court in ruling
on a motion for summary judgment.  Fed. R. Civ. P. 56(c); Beyene v.
Coleman Security Services, Inc., 854 F.2d 1179, 1181 (9th Cir.
1988).

In deciding whether to grant summary judgment, a court must
take three necessary steps: (1) it must determine whether a fact is
material; (2) it must determine whether there exists a genuine
issue for the trier of fact, as determined by the documents
submitted to the court; and (3) it must consider that evidence in
light of the appropriate standard of proof.  Anderson, 477 U.S. at
248.  Summary Judgement is not proper if material factual issues

13

1  exist for trial.  <u>B.C. v. Plumas Unified Sch. Dist.</u>, 192 F.3d 1260,

2  1264 (9th Cir. 1999).  "As to materiality, only disputes over facts

3  that might affect the outcome of the suit under the governing law

4  will properly preclude the entry of summary judgment."  <u>Anderson</u>,

5  477 U.S. at 248.  Disputes over irrelevant or unnecessary facts

6  should not be considered.  <u>Id.</u>  Where there is a complete failure

7  of proof on an essential element of the nonmoving party's case, all

8  other facts become immaterial, and the moving party is entitled to

9  judgment as a matter of law.  <u>Celotex</u>, 477 U.S. at 323.  Summary

10  judgment is not a disfavored procedural shortcut, but rather an

11  integral part of the federal rules as a whole.  <u>Id.</u>

12

13  **III. Defendants' Motion for Summary Judgment of Non-Infringement**

14  **and Invalidity 5,781,647 (##580, 742)**

15  The '647 patent discloses a "gambling chip recognition

16  system," and in particular, "[a] computer implemented gambling chip

17  recognition system having the ability to capture an image of a

18  stack of gambling chips and automatically processing the image to

19  determine the number of chips within the stack and the value of

20  each."  '647 Patent Abstract.  The patent stems from an application

21  filed in October 1995, and the PTO issued the '647 patent to Glenn

22  Fishbine and Jack Klingert on July 14, 1998.  Shuffle Master and

23  IGT currently each own a 50% interest in the rights of the patent.

24  The accused MP21 system, developed by Richard Soltys and Richard

25  Huizinga, is owned and currently being marketed by Bally

26  Technologies.

27

28

1    Defendants argue that the MP21 does not infringe the '647

2   patent, and that the patent is in any case invalid in light of

3   prior art.

4

5    **A.   Patent Infringement**

6    Any person who "without authority makes, uses, offers to sell,

7   or sells any patented invention, within the United States . . .

8   infringes the patent." 35 U.S.C. § 271(a).  Infringement analysis

9   involves two steps:  first, the claim scope is determined; second,

10  the properly construed claim is compared with the accused device to

11  determine whether all of the claim limitations are present either

12  literally or by a substantial equivalent.  Amazon.com, Inc. v.

13  Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001).

14   Claims within a patent may be divided into independent and

15  dependent claims.  Independent claims are those which do not refer

16  directly to other claims.  Dependent claims, as their name

17  suggests, "depend" on the referenced independent claim and place

18  additional limitations onto that independent claim.  If an accused

19  product does not infringe an independent claim of the asserted

20  patent, it cannot infringe any of the claims that depend on the

21  independent claim.  Jeneric/Pentron, Inc. v. Dillon Co., Inc., 205

22  F.3d 1377, 1383 (Fed. Cir. 2000).

23

24   **B.   Literal Infringement**

25   Because each claim is a separate statement of the patented

26  invention, a patent is infringed if any one of its claims is

27  infringed.  Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211,

28  1220 (Fed. Cir. 1995).  A device is not saved from infringement by

15

1  adding elements beyond those claimed in a patent; if a claim reads

2  on part of an accused device, then the entire accused device

3  infringes on the claim.  Suntiger, Inc. v. Scientific Research

4  Funding Group, 189 F.3d 1327, 1336 (Fed. Cir. 1999).  Conversely,

5  if an accused device or process does not include each and every

6  limitation of a patent claim, there is no literal infringement.

7  Spectrum Int'l, Inc. v. Sterlite Corp., 164 F.3d 1372, 1379 (Fed.

8  Cir. 1998).

9

10      **C.  The Doctrine of Equivalents**

11      The doctrine of equivalents operates to ensure that "[m]ere

12  colorable differences, or slight improvements, cannot shake the

13  right of the original inventor."  Hilton Davis Chemical Co. v.

14  Warner-Jenkinson Co., Inc., 62 F.3d 1512, 1517 (Fed. Cir. 1995)

15  (internal citations omitted).  The doctrine loosens the

16  requirements of literal infringement, allowing a finding of

17  infringement where one or more limitations of an asserted claim are

18  not met literally, but are met by an equivalent embodiment.  KCJ

19  Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1359 (Fed. Cir.

20  2000).

21      The Federal Circuit has identified several tests for

22  identifying when a claim limitation is met by an equivalent

23  structure.  One test is whether "the differences between the two

24  are 'insubstantial' to one of ordinary skill in the art."  KCJ, 223

25  F.3d 1359.  Another test is whether the element in the accused

26  device that does not literally infringe "performs substantially the

27  same function in substantially the same way to obtain the same

28  result."  Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S.

16

605, 608 (1950).  The determination of equivalence should be applied as an objective inquiry on an element-by-element basis. Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co., 520 U.S. 17, 40 (1997).  Whether the accused device contains each claim element exactly or its equivalent is a question of fact.  KCJ, 223 F.3d at 1353.

### D.   Prosecution History Estoppel against the Invocation of the Doctrine of Equivalents

If a patentee disclaims subject matter during a patent's prosecution through a narrowing amendment, prosecution history estoppel prevents that patentee from using the doctrine of equivalents to reclaim the disclaimed subject matter.  Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. ("Festo VIII"), 535 U.S. 722, 740 (2002).  The mere addition of a narrowing amendment does not prevent assertion of all equivalents to that limitation.  Id. at 740.  Instead, the narrowing amendment gives rise to a presumption of estoppel which the patentee may rebut by proving either (1) that the amendment was made for a purpose unrelated to patentability, id. (citing Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 33 (1997)), or (2) that the amendment did not surrender the exact equivalent in question.  Festo VIII, 535 U.S. at 740-41.  Rebuttal of the presumption of surrender is a question of law to be determined by the court.  Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. ("Festo IX")), 344 F.3d 1359, 1367-68 (Fed. Cir. 2003).  The patentee has the burden of showing that a narrowing amendment does not surrender a particular equivalent.  See Festo VIII, 535 U.S. 740.

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### E.   Prosecution History Disclaimer and Specification Disclaimer

A patentee is "is not entitled to a claim construction divorced from the context of the written description and prosecution history." Nystrom v. TREX Co., 424 F.3d 1136, 1144-45 (Fed. Cir. 2005).  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Phillips, 415 F.3d at 1317. The Court must therefore "examine the patent's prosecution history, when placed in evidence, to determine whether the inventor disclaimed a particular interpretation of a claim term during the prosecution of the patent in suit or during the prosecution of an ancestor application." Ventana Med. Sys., Inc. v. Biogenex Lab., Inc., 473 F.3d 1173, 1182 (Fed. Cir. 2006); see also Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1349 (Fed. Cir. 2004).  "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." Southwall Techs. v. Cardinal IG Co., 54 F.3d 1570, 1576-77 (Fed. Cir. 1995).

Fundamentally, "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." Southwall Techs., 54 F.3d at 1576-77.  However, a disclaimer of scope in the prosecution history must be clear and unambiguous. Omega Eng'g, Inc., v. Raytek Corp., 334 F.3d 1314, 1324 (Fed. Cir. 2003).

18

In addition, "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." Phillips, 415 F.3d at 1316.  In such a case, "the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive."  Id. (emphasis supplied); see also SciMed, 242 F.3d at 1344 ("[T]he written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.").  Where the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."  SciMed, 242 F.3d at 1341.

Defendants argue that Plaintiffs' infringement theory is "an improper attempt to reclaim material disclaimed during the prosecution of the '647 patent."  Arguably, this is an issue that should have been raised at the Markman hearing, although the closely related issue of "prosecution estoppel" is a doctrine that is specifically triggered by infringement analysis.[2]  The parties

---

[2]The term "prosecution disclaimer" is used where coverage of a particular subject matter is disclaimed in the prosecution of a patent.  The disclaimer may be independent, or in conjunction with a disclaimer in the specification.  See generally Scimed Life Systems, Inc., v. Advanced Cardiovascular Systems, Inc., 242 F.3d 1337 (Fed. Cir. 2001).  The term "prosecution history estoppel" (alternatively, "argument based estoppel") is used for essentially the same phenomenon, where a party is estopped from claiming an alleged infringement by way of the doctrine of equivalents because (continued on next page)

1   have presented their evidence and arguments on the issue, and the

2   Court perceives no procedural obstacle, and more importantly, no

3   prejudice to Plaintiffs in considering Defendants' disclaimer

4   arguments.

5

6      **F.   Infringement Analysis**

7      Defendants argue that the MP21 system does not read onto the

8   '647 patent because (1) it does not identify chip edges (as

9   required by all claims); (2) the system does not use "pixel

10   variance" (as required by claim 6 and its dependent claims); and

11   (3) the system does not use an image converter, frame grabber,

12   video camera or video image (as required by claims 2, 3, and 7).

13   Defendants also argue that the method claims (claims 5 and 15) are

14   not infringed, or at least they are not infringed by the design and

15   sale of the MP21 system.

16      The '647 patent has three independent claims (claims 1, 5, and

17   6), and a total of 16 claims.  All three independent claims

18   disclose determining the number of chips in the stack "by

19   identifying chip edges for each chip," '647 Patent 7:30-31, 7:51,

20   or "by identifying the edges of each chip."  <u>Id.</u> 8:1-2.   The

21   Court's claim construction Order adopted the following definitions

22   by stipulation:

23         "chip edges":  the transition between a chip and
           something that is not that chip
24

25 ────────────

26   of a disclaimer that was made in the prosecution of the patent in
  order to secure approval.  The Federal Circuit has acknowledged

27   that there is "a relation" between the theories and that the
  standard is very close to the same in either case.  <u>Omega Eng'g,</u>

28   <u>Inc.</u>, 334 F.3d at 1325 n.1.

1                "edges of each chip and edges of each individual chip":
2                a dividing line between a chip and something that is not a chip

3 (Order of Dec. 20, 2005 at 55 (#322-3).)   The parties agree that

4 the latter definition should be altered, and pursuant to the

5 parties' agreement, the terms will share a common definition: "the

6 transition between a chip and something that is not that chip."

7     Defendants argue that the MP21 system does not identify or

8 detect chip edges, but instead detects "stripes" or "streaks" on

9 the sides of the chips.   They note that while the MP21 system uses

10 graphical "edge detection," as that term is used in the parlance of

11 the field of digital image processing, this edge detection is not

12 directed towards "chip edges."   Defendants note that the

13 programming code found in the EdgeLocator code module actually

14 looks for the color transitions that embody stripes.   Defendants

15 further rely on the "experimental evidence" submitted by Dr. Trevor

16 Darrell.   In Dr. Darrell's experiment, the system was able to

17 identify the number of chips based on the two-dimensional images

18 which have been included in Appendix A.   While Dr. Darrell submits

19 that it has been demonstrated that the system does not use chip

20 edges, (Darrell Decl. (#569) ¶¶ 78-84), the Court finds that the

21 experiment demonstrates that (1) the system can identify the number

22 of chips where most chip edges are either absent or substantially

23 missing, and (2) that the chips themselves can be factored out of

24 the operation of the system, such that "chips" can be counted when

25 the chips are absent but the streaks are present.   Defendants also

26 submit Huizinga's declaration, demonstrating that the system is not

27 capable of counting chips that do not have streaks.   (Huizinga

28

21

1    Decl. (#772).)[3]

2        Plaintiffs vigorously dispute Dr. Darrell's interpretation of

3    his own demonstration, but they do not dispute that the MP21 system

4    operates as Dr. Darrell described it did — that is, that the MP21

5    correctly identified the number of chips based upon the

6    representations in Appendix A.  In response to Huizinga's

7    declaration, Plaintiffs assert that the system could conceivably be

8    re-programmed to count chips without streaks, which Defendants do

9    not dispute.  The Court notes that here and elsewhere the

10   capabilities and operation of a different system are not at issue

11   in this case.  Citing Dr. Castleman's rebuttal testimony,

12   Plaintiffs argue that Dr. Darrell's demonstration is not the

13   "normal" usage of the system.  The observation is irrelevant

14   insofar as the demonstration is submitted as a demonstration of the

15   system's mechanics and internal logic, not its operation under

16   normal circumstances.  That said, Plaintiffs certainly make the

17   point that Defendants' demonstration really just demonstrates that,

18   insofar as some streaks edges correspond with chip edges, not all

19   chip edges are necessary for the system's operation.

20       Plaintiffs also rely on Dr. Castleman's analysis of the

21   programming source code used to create the software utilized by

22   MP21.  Indeed, his analysis of the source code for the software is

23   repeated numerous times with only slight variation in Plaintiffs'

24   briefing.  In summation, Dr. Castleman analyzes several programming

25   code modules (ProcessCandidateEdges, GetCenter, GetRadius, and

26   ─────────────────────

27       [3]Although this declaration was filed with Defendants reply,
     Plaintiffs have had abundant opportunities to respond and have done
28   so.

                                    22

1  IdentifyChipCandidate) and generally concludes:

2      No transition gets included in the sequence of transitions
       that are considered without first being compared to the left
3      and right edges determined from the calculated center and
       radius.  Further, the order in which the transitions are
4      evaluated in denomination matching is determined by proximity
       to the calculated center.  As such, the overall algorithm for
5      determining the value of a chip is dependent on the calculated
       center and radius and thus on the left and right edges of the
6      chip that have been located by the previous analysis.

7  (Castleman Decl. (#695) ¶ 219.)  Defendants have objected (#759) to

8  this opinion because they contend it was not disclosed in

9  compliance with Federal Rule of Civil Procedure 26(a)(2)(B).

10 Plaintiffs response is largely that the "additional opinions" grew

11 out of the opinions that were originally disclosed.  The failure to

12 be more specific at the outset does not appear to have been totally

13 inconsequential, since Defendants assert that two of the routines

14 Castleman analyzes are actually not part of the public, production

15 version of the MP21 system.[4]  Nevertheless, it is appropriate for

16 the Court to consider the issue of how the software works in this

17 case, and Defendants do not dispute that ProcessCandidateEdges is a

18 component of the production MP21 system.  Dr. Castleman's opinion

19 responds to Defendants' arguments, and is not unrelated to his

20 original opinion.

21     Having very carefully considered Dr. Castleman's declaration,

22 the Court finds that Plaintiffs cannot show literal infringement.

23 First, examining streaks and stripes, some of which may

24 "correspond" to chip edges, others of which will not, is simply not

25 the same as examining the direct visual indicia of "chip edges."

26 Second, while the system identifies some streak edges that

27 _____

28     [4]In light of Section 271(a), Defendants' point is unclear.

23

1   correspond to chip edges, Defendants have demonstrated that the

2   system does not actually identify the edges of <u>each</u> chip.

3       This said, it does not matter whether Plaintiffs' infringement

4   theory must sound in the doctrine of equivalents or not, because

5   Defendants' argument that Plaintiffs are trying to recover matter

6   that was previously disclaimed is clearly meritorious.  The '647

7   patent's description of the prior art explained that prior systems

8   had required chips to have their edges encoded:

9       One of the problems with the system disclosed in U.S. Pat. No.
        4,814,589 is that the system requires the disc-like objects,
10      such as gambling chips, coins, tokens, etc., have machine
        readable information encoded about the periphery thereof.
11      Another system having similar problems is disclosed in U.S.
        Pat. No. 5,103,081 to Fisher.  It describes a gambling chip
12      with a circular bar code to indicate the chips denomination,
        authenticity and other information.  The chip validating
13      device rotates the chip in order to read the circular bar
        code.  [ ¶ ] . . . . There is a need for a system that can
14      determine the value of gambling chips without encoding the
        periphery of each chip to enable system determination of its
15      value.

16  '647 Patent 1:55-2:6.  The specification thus indicates that

17  "identifying" within the terms of the independent claims of the

18  '647 patent does not mean identifying by way of marks on the sides

19  of chips.  <u>See</u> <u>SciMed</u>, 242 F.3d at 1341.  The whole point of the

20  '647 patent is to count and identify chips without utilizing

21  identifying markings.  To the extent that there are any lingering

22  doubts, they are eliminated by the prosecution history.

23      The patentee had sought to patent: "performing the step of

24  comparing each said chip representation against said plurality of

25  predetermined chip representations to determine the value of each

26  chip within the stacked pile."  (Ex. 22, SM-MP 000956, Smith Decl.

27  (vol. 2) (#582).)  The original language clearly covered

28  identifying chips utilizing identifying markings.  In order to

24

1 overcome rejection due to obviousness the patentee made several
2 arguments, including that: "[t]his method of determining the number
3 of chips in a stack of chips . . . does not require use of any
4 identifying markings . . ." (Ex. 22, SM-MP 000960, Smith Decl.
5 (vol. 2) (#582).)  The patentee also argued that prior art was
6 distinguishable because binary codes were not encoded on chips and
7 because prior systems did not process an image of an entire stack
8 of chips. (Id. at SM-MP 000960 - SM-MP 000961.)  Plaintiffs argue
9 that the surrender of claim scope only applies to systems that
10 utilize bar codes, not to any system that utilizes "identifying
11 markings" on the sides of the casino chips.  Adopting Plaintiffs'
12 theory would require the Court to simply ignore the patentee's
13 multiple arguments to the examiner.  The previous claim language
14 was extraordinarily broad and obviously covered systems utilizing
15 "identifying markings," with or without chip edges, and Plaintiff's
16 argument to the examiner does not leave any ambiguity regarding
17 whether the '647 patent claims systems utilizing "identifying
18 markings."  There is nothing here to rebut the presumption that the
19 patentee has surrendered all territory between the original claim
20 limitation and the amended claim limitation, and the patentee's
21 statement was, in any case, a clear disclaimer.

22     In sum, whether viewed through the lens of specification
23 disclaimer, prosecution disclaimer, or prosecution history
24 estoppel, the MP21 system does not infringe the '647 patent.  As
25 this issue is dispositive, it is not necessary to address
26 Defendants' other arguments regarding non-infringement.  The Court
27 will nevertheless briefly observe that (1) "pixel variance" (claim
28 6) clearly means statistical variance within the context of the

25

1  specification and the prosecution history,[5] and (2) the issues

2  concerning "video" technology — that is, the image converter, frame

3  grabber, video camera, and video image requirements (claims 2, 3,

4  and 7) — track the same infringement issues in the '871 patent.

5  The significant difference is that Plaintiffs have not argued that

6  the doctrine of equivalents would apply with respect to this

7  patent.

8

9  **G. Invalidity**

10  Patent claims are presumed to be valid, 35 U.S.C. § 282, and

11  the party seeking to show invalidity must prove facts supporting

12  invalidity by clear and convincing evidence.  N. American Vaccine,

13  Inc. v. American Cyanamid Co., 7 F.3d 1571, 1579 (Fed. Cir. 1993).

14

15  **H.  Anticipation Standard**

16  Anticipation under 35 U.S.C. § 102 is a question of fact.

17  Merck & Co., Inc. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1369

18  (Fed. Cir. 2003).  "That which infringes if later, anticipates if

19  earlier."  SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312

20  (Fed. Cir. 2006).  "A patent is invalid for anticipation if a

21  single prior art reference discloses each and every limitation of

22

23

24  [5]The patentee stated, for example:  "[t]he variance values
illustrate the point in the cross-section where the variance grows

25  large enough to indicate a statistical edge value," and "[t]he
number of statistical edges the processor detects helps the

26  computer determine the number of gambling chips in a stack."  (Ex.
22, SM-MP 000960-61, Smith Decl. (vol. 2) (#582).)  In addition,

27  the specification provides the equation for statistical variance as
the "variance equation."  '647 Patent 4:55-65.  This issue is not

28  close.

1   the claimed invention." Schering Corp. v. Geneva Pharmaceuticals,

2   339 F.3d 1373, 1377 (Fed. Cir. 2003). "[A] prior art reference may

3   anticipate without disclosing a feature of the claimed invention if

4   that missing characteristic is necessarily present, or inherent, in

5   the single anticipating reference." Id.

6

7   **I.  Anticipation Analysis**

8   Defendants argue that the '647 patent, at least as interpreted

9   by Plaintiffs, is anticipated by U.S. Patent 4,531,187 ('187).

10  They assert that, because Plaintiffs infringement theory eliminates

11  the chip edges requirement from the '647 patent, it need not be

12  found in prior art for the purposes of anticipation.[6]  Plaintiffs,

13  on the other hand, argue that the '187 patent lacks "imaging a

14  stacked pile of chips, storing chip representations, determining

15  the number of chips in a stacked pile by identifying chip edges,

16  calculating chip representations, computing pixel variance values,

17  and applying an edge detection filter."  (P.s' Corrected Memo. in

18  Opp. to Def.s' Fourth Mot. for Summ. J. (#722) 8.)

19  The '187 patent discloses "a single video camera in the

20  ceiling of the room," '187 Patent 3:48, and the crucial additional

21  disclosure in that patent's specification appears to the Court to

22  be the following:

23      The mechanical and electrical units which identify the cards
        and chips are effectively modifications of presently available
24      scanners.  For example, scanners now used in optical character
        recognition apparatus for inputting of typewritten material to
25      a word processor or other computing equipment are available,

26  ────────────────

27      [6]The Court finds this argument unpersuasive, and perhaps it is
    even rhetorical.  However, the Court will address Defendants'
28  reliance on the '187 patent.

27

1    which application is far more demanding than chip and card
2    recognition.  Typically, a video camera supplies the composite
     video signal to a video amplifier, synchronization pulse
3    separator and color separation unit 40.  This outputs the
     separate red, green and blue video signals to recognition and
4    shift registers 42, 43, 44.  These are used by chip
     recognition unit 46 and card recognition unit 48 to identify
5    the cards dealt and the chips bet. . . .  Chip recognition is
     done typically on the basis of the color of the chip, in
6    accordance with the usual practice according to which chips of
     different colors represent different bet amounts.

7    '187 Patent 4:3-33.

8        The parties have very different interpretations of this patent

9    and of this disclosure.  Plaintiffs assert that the '187 patent

10   only uses chip color to identify chips (although the patent

11   implicitly counts chips as well)[7], whereas Defendants assert that

12   the patent inherently discloses edge detection image processing

13   techniques in stating that known optical character recognition

14   techniques could be utilized to identify both cards and chips.

15   (Darrell Decl. (#569) ¶ 123.)  As Defendants note, it is

16   uncontroversial that optical character recognition techniques

17   involve edge detection.  Defendants assert that the patent

18   inherently covers imaging stacked chips on a table because that is

19   the normal operation of casino tables.  Plaintiffs argue that the

20   '187 does not disclose the application of optical character

21   recognition techniques to the casino monitoring context, and

22   apparently that the mention of optical character recognition

23   technology was more or less random.  In light of the comparison of

24   the computing resources required for optical character recognition

25

26       [7]For example, the '187 patent claims "means for determining
     the bets of each player."  '187 Patent 6:4.  There is no overt
27   indication that the system would require players not to stack their
     chips in order to identify the chips in play, which is, of course,
28   ordinary game play.

1  to those required for chip recognition, this is a dubious but not

2  utterly implausible reading of the '187 patent.  More

3  fundamentally, the perhaps forward looking '187 patent, applied for

4  in 1982 and issued in 1985, is not terribly clear in its

5  disclosure.  The '187 mentions color in describing the nature of

6  video technology, and states that color will be used to identify

7  chips.  To the extent that any image processing technique uses

8  digital values for pixel color, the patent's scope is arguably very

9  broad.  But, also arguably, the '187 patent does not disclose a

10 means of counting chips even as such a means would appear to be

11 implicit in the patent's claims.  See '187 Patent 6:4 & 6:10-13

12 (claiming "means for determining the bets placed by each player"

13 and "means for determining whether each player's bet has either

14 been correctly paid out or collected from him").  To the extent

15 such a disclosure is made, it certainly does not explicitly

16 disclose counting chips by means of utilizing the chip edges, nor

17 does it disclose storing chip representations.  Thus, the inherent

18 disclosures in the '187 patent are disputed questions of fact.

19      In sum, while the '187 patent is certainly suggestive, summary

20 judgment is not warranted based on anticipation of the '647 patent

21 by the '187 patent.

22

23      **J.   Obviousness Standard**

24      A patent may be invalidated as obvious "if the difference

25 between the subject matter sought to be patented and the prior art

26 are such that the subject matter as a whole would have been obvious

27 at the time the invention was made to a person having ordinary

28 skill in the art to which said subject matter pertains."  35 U.S.C.

29

1  § 103(a).  Obviousness is a question of law.  See Richardson-Vicks,

2  Inc. v. Upjohn Co., 122 F.3d 1476, 1479 (Fed. Cir. 1997); see also

3  Quad Environmental Technologies Corp. v. Union Sanitary Dist., 946

4  F.2d 870, 876 (Fed. Cir. 1991) ("The courts are the final arbiter

5  of patent validity and, although courts may take cognizance of, and

6  benefit from, the proceedings before the patent examiner, the

7  question is ultimately for the courts to decide, without deference

8  to the rulings of the patent examiner.").  The legal conclusion as

9  to obviousness is, of course, based on underlying factual

10 determinations, including: "(1) the scope and content of the prior

11 art; (2) the level of ordinary skill in the art; (3) the

12 differences between the claimed invention and the prior art; and

13 (4) the extent of any proffered objective indicia of

14 nonobviousness, sometimes termed secondary considerations, such as

15 commercial success, long felt but unresolved needs, and failures of

16 others."  Dystar Textilfarben GmbH v. C.H. Patrick Co., 464 F.3d

17 1356, 1360 (Fed. Cir. 2006) (citing Graham v. John Deere Co., 383

18 U.S. 1, 17-18 (1966)).  Obviousness is evaluated on a "claim by

19 claim" basis.  Dystar, 464 F.3d at 1372.

20    The Supreme Court has recently observed that "[g]ranting

21 patent protection to advances that would occur in the ordinary

22 course without real innovation retards progress and may, in the

23 case of patents combining previously known elements, deprive prior

24 inventions of their value or utility."  KSR International Co. v.

25 Teleflex Inc., 127 S.Ct. 1727, 1741 (2007); see also John F. Duffy,

26 Inventing Invention: A Case Study of Legal Innovation, 86 TEX. L.

27 REV. 1, 12 (2007) ("The most important function of the

28 nonobviousness doctrine is to prevent individuals from patenting

obvious, yet economically significant, responses to new conditions or 'exogenous' developments — i.e., developments achieved through some cause not attributable to the patent applicant's efforts. There is no good substitute for the nonobviousness doctrine in these circumstances."). "[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR, 127 S.Ct. at 1741.  However, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." Id. at 1737. "If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability." Id. at 1740 (emphasis supplied). Further, KSR teaches that "a person of ordinary skill is also a person of ordinary creativity, not an automaton." Id. at 1742.  A combination of elements may therefore be found obvious if that combination was "obvious to try."[8] Id.  "[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond that person's skill." Id. at 1740.

The Court noted that:

[a]lthough common sense directs one to look with care at a patent application that claims as innovation the combination of two known devices according to their established functions, it can be important to identify a reason that would have

---

[8]This holding overruled longstanding lower court precedent dating back to the 1960s.  See Harold C. Wegner, Commentary, Making Sense of KSR and Other Recent Patent Cases, 106 Mich. L. Rev. First Impressions 39, 41 (2007), available at http://www.michiganlawreview.org/firstimpressions/vol106/wegner.pdf.

31

1           prompted a person of ordinary skill in the relevant field to

2           combine the elements in the way the claimed new invention
          does.

3 Id. at 1741.  "[T]here must be some articulated reasoning with some

4 rational underpinning to support the legal conclusion of

5 obviousness."  In re Kahn, 441 F.3d 977, 988 (Fed. Cir. 2006); see

6 also KSR Int'l Co. v. Teleflex Inc., 127 S.Ct. 1727, 1741 (2007)

7 ("To facilitate review, this analysis should be made explicit.")

8 (citing  Kahn, 441 F.3d at 988).  A court should be wary of

9 reasoning based on hindsight.  See Graham, 383 U.S. at 36.

10      Nothing in KSR alters the statutory burden placed on the

11 challenger of a patent:  The patent challenger must make a factual

12 showing of obviousness by clear and convincing evidence.

13 PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1360

14 (Fed. Cir. 2007).  At the same time, the Supreme Court emphasized

15 in KSR that: "[t]he ultimate judgment of obviousness is a legal

16 determination," 127 S.Ct. at 1745, and a conclusory expert

17 affidavit therefore should not prevent summary judgment.  Id.

18      "Once a prima facie case of obviousness has been established,

19 the burden shifts to the applicant to come forward with evidence of

20 nonobviousness to overcome the prima facie case."  In re Huang, 100

21 F.3d 135, 139 (Fed. Cir. 1996).  The Federal Circuit has recently

22 sought to clarify that under Federal Circuit law the burden on a

23 challenger to a patent never changes even when the burden of

24 production is shifted to the other party after the challenger puts

25 forward a prima facie case of invalidity.  Pfizer, Inc. v. Apotex,

26 Inc., 480 F.3d 1348, 1359 (Fed. Cir. 2007) (quotations and

27 citations omitted).

28

**The "TSM" Test**

Plaintiffs argue that this Court should apply the so-called TSM ("teaching, suggestion, motivation") test, and that KSR does not amount to a change, or at least a substantial change in the law.  They assert that all of Defendants' arguments amount to improper reasoning grounded in hindsight.[9]

Although the Supreme Court noted in KSR that the Court of Customs and Patent Appeals had captured a "helpful insight" in adopting this test, id. at 1741, we do not agree with Plaintiffs' contention that the Supreme Court effectively endorsed the TSM test.  Nor do we find the exact status of the test as a general matter to be of particular importance in this case.  However, because parts of this case turn on the correct interpretation of KSR, we elaborate further on our understanding of KSR in this area.

Prior to KSR, it was "well-established that before a conclusion of obviousness may be made based on a combination of references, there must have been a reason, suggestion, or motivation to lead an inventor to combine those references." Pro-Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1573 (Fed. Cir. 1996).  Although at oral argument in KSR justices of the Supreme Court strikingly called the "teaching, suggestion, and motivation" test "irrational," "gobbledygook," and "meaningless," (Justice Scalia), as well as "jargon" that is "worse

---

[9] See Duffy, Inventing Invention, supra, at 64-65 ("If the problem of hindsight were the only consideration relevant when applying obviousness, the best solution would be to abolish the doctrine entirely.  All obviousness inquiries suffer from the possibility of hindsight bias because they are inherently retrospective.")

1  than meaningless" (Chief Justice Roberts),[10] the ultimate,

2  unanimous decision in KSR suggested that the TSM test might be

3  salvageable if the test was applied flexibly.  127 S.Ct. at 1743.

4  The Court neither endorsed nor rejected the test, at least to the

5  extent that it is applied flexibly and with appropriate deference

6  to common sense.[11]

7       With this in mind, a summary of the errors the Supreme Court

8  found in the Federal Circuit's application of the TSM test in KSR

9  is instructive for this Court:

10              1. Very simply, the Federal Circuit had applied an overly

11              rigid test.  The rigidity had allowed an obvious patent

12              to escape invalidation, which stifled rather than

13              promoted progress.  In applying a rigid test, "The Court

14              of Appeals . . . drew the wrong conclusion from the risk

15              of courts and patent examiners falling prey to hindsight

16              bias."  Id. at 1742.

17              2.  Partly as a result of the rigid application of the

18              test, the Federal Circuit had wrongly assumed the person

19              of ordinary skill in the art would only consider prior

20  _____

21       [10]See Hr'g Tr., KSR International Co. v. Teleflex, Inc., 04-
    1350, at 40-41, Nov. 28, 2006; Stephen G. Kunin & Andrew Beverina,
22  Commentary, KSR's Effect on Patent Law, 106 MICH. L. REV. FIRST
    IMPRESSIONS 50, 51-52 (2007) ("Kunin and Beverina"), available at
23  http://www.michiganlawreview.org/firstimpressions/vol106/kuninbever
    ina.pdf.
24

25       [11]Notably, the Court stated that "it can be important to
    identify a reason that would have prompted a person of ordinary
26  skill in the relevant field to combine the elements in the way the
    claimed new invention does."  KSR, 127 S.Ct. at 1741 (emphasis
27  supplied).  The implication is that there are, or at least might be
    cases where an invention is so obvious that it is not even
28  necessary to delve into reasons to combine the prior art.

1    art designed to solve the same problem.  KSR, 127 S.Ct.

2    at 1740.  Put another way, the person of ordinary skill

3    had improperly been rendered an "automaton."  Id. at

4    1742.  The Supreme Court held that:  "the analysis need

5    not seek out precise teachings directed to the specific

6    subject matter of the challenged claim, for a court can

7    take account of the inferences and creative steps that a

8    person of ordinary skill in the art would employ."  Id.

9    at 1741.  We note that Defendants are correct that

10   Plaintiffs have studiously ignored this aspect of KSR.

11   3.   Relatedly, the Federal Circuit had erroneously held

12   that a claim to a purportedly novel combination cannot be

13   obvious because it was "obvious to try," id. at 1742, and

14   as a result, factfinders had been denied access to common

15   sense.  Id.

16   4.   The Federal Circuit had wrongly found that a

17   conclusory expert affidavit was sufficient to overcome

18   summary judgment.  Id. at 1745-46.

19   Following KSR, the Federal Circuit has been sensitive to the

20   varying levels of relevance the TSM test has in different contexts.

21   In Takeda Chemical Industries, Ltd. v. Alphapharm Pty., Ltd., 492

22   F.3d 1350 (Fed. Cir. 2007), the circuit broadly held that a

23   flexible version of the TSM test must be applied "in cases

24   involving new chemical compounds."  Id. at 1357.  However, in other

25   contexts, the Federal Circuit has not explicitly applied the test,

26   and has emphasized that "[a]n obviousness determination [in the

27   case of a combination of prior art] is not the result of a rigid

28   formula disassociated from the consideration of the facts of a

35

1    case."  Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d

2    1157, 1161 (Fed. Cir. 2007) (modification supplied); see also id.

3    at 1161 ("Accommodating a prior art . . . device . . . to modern

4    electronics would have been reasonably obvious to one of ordinary

5    skill in [the art]" because "[a]pplying modern electronics to older

6    . . . devices has been commonplace in recent years."); In re

7    Comiskey, 499 F.3d 1365, 1380 (Fed. Cir. 2007) ("The routine

8    addition of modern electronics to an otherwise unpatentable

9    invention typically creates a prima facie case of obviousness.").

10   All this said, even before KSR the Federal Circuit had held that in

11   some circumstances the "suggestion" to combine innovations "may

12   . . . come from the nature of a problem to be solved. . . ."

13   Pro-Mold and Tool Co., 75 F.3d at 1573; see also Alza Corp. v.

14   Mylan Labs., Inc., 464 F.3d 1286, 1291 (2006).

15

16        K.    Obviousness Analysis

17             1.    Scope and Content of the Prior Art

18        As Defendants note and as Plaintiffs' expert on invalidity

19   readily concedes, imagers, data storage, image processing, frame

20   grabbers, and image converters all existed in the prior art.  They

21   are all used in the '647 patent's disclosure in a facially

22   predictable manner.  Neither the hardware nor the software to

23   implement the invention was unknown.  The patent itself actually

24   mentions that the edge detection algorithm was "conventional."

25   '647 Patent 6:20-21.  In sum, the '647 patent is in substantial

26   part the type of patent that triggers the concerns raised in KSR.

27   Plaintiffs, however, argue that the invention was not obvious

28   because the prior art did not disclose imaging a stacked pile of

36

1  chips, using generated predetermined chip representations, and edge

2  detection of a stack of chips.

3      Although prior art appears to have disclosed counting stacked

4  chips, the record does not indicate that prior art specifically

5  disclosed imaging a stack of chips on a table from the side.  The

6  most significant patented prior art that Defendants cite is clearly

7  the '187 patent, which states that it adopts "scanners now used in

8  optical character recognition apparatus" to identify chips, and

9  thus, again, arguably utilizes edge detection techniques to

10  identify chips.  Again, the embodiment described in that patent is

11  vague.  The '647 patent also cites as prior art the '392 patent

12  (Merton), which identifies coins by the marks on their sides and

13  compares observations to stored representations (which it terms

14  "fingerprinting").[12]

15      Plaintiffs object to the scope of the prior art that

16  Defendants have cited, and at oral argument Plaintiffs argued that

17  KSR is distinguishable because the holding of that case should be

18  limited to cases where the combination is "specific," or of "two

19  known devices."  See KSR, 127 S.Ct. at 1741.  The argument verges

20  on bizarre.  As a point of reference, Defendants properly recite

21  and emphasize the facts of KSR.  There, the patent at issue

22  disclosed "a position-adjustable pedal assembly with an electronic

23  pedal position sensor attached to the support member of the pedal

24  assembly.  Attaching the sensor to the support member allows the

25  sensor to remain in a fixed position while the driver adjusts the

26  _____

27      [12]See also U.S. Patent No. 5,494,147 (describing "a coin
   discriminating apparatus for discriminating coins by optically
28  detecting coin surface patterns.").

pedal." 127 S.Ct. at 1737 (quoting the district court). The prior
art included at least six patents that the Supreme Court
considered: U.S. Patent 5,010,782, a structure for housing an
adjustable mechanical brake pedal that had a fixed pivot point;
U.S. Patent 5,460,061, a sliding brake mechanism that allowed both
the pedal and the pivot point to be adjusted; U.S. Patent
5,241,936, a pedal with an electronic sensor on a pivot point in
the pedal assembly; U.S. Patent 5,063,811, a sensor on a fixed part
of the pedal assembly rather than on the pedal's footpad; U.S.
Patent 5,819,593, an adjustable pedal assembly with an electronic
sensor for detecting the pedal's position; U.S. Patent 5,385,068, a
modular sensor, designed independently, that can be taken off the
shelf and attached to mechanical pedals of various sorts. See 127
S.Ct. at 1735-36. The Supreme Court held that the prior art fit
together like "pieces of a puzzle," id. at 1742, and it is quite
clear that the Court saw no significance in the number or pieces.
Indeed, an abundance of relevant prior art does not itself detract
from the likelihood that an innovation is obvious.

### 2. Differences Between the Prior Art and the Claims at Issue

The '647 patent discusses the Storch and Fisher patents,
noting that a key difference between the '647 patent and the prior
art is that the disclosure in the '647 patent utilizes neither
identifying markings nor a reading device in which the chips would
be housed. '647 Patent 1:47-65. To some extent, Defendants'
citation to these patents arises out of Plaintiffs' attempt to
recapture what was previously disclaimed. However, the Storch and

38

Fisher patents are different from the '647 patent in the manner that is discussed by the '647 patent's specification.

Plaintiffs argue that the prior art cited by Defendants does not identify chip edges of stacked chips and the utilization of predetermined chip representations.  Again, this appears to be debatable with respect to the '187 patent.  If one considers machine vision techniques with respect to disc-like objects, however, it is indisputable that edge detection had been used to identify like objects, and further, that predetermined representations had been used as a computational strategy.

What we are left with are really two questions: (1) what exactly does the '187 disclose, and (2) whether the specific application of these techniques was obvious <u>in this context</u>.  Unlike <u>KSR</u>, the '647 patent involves the importation of "conventional" image processing techniques from one field, image processing, into another field, casino surveillance.[13]  Thus, the level of ordinary skill in the art is the most significant factor to be considered in evaluating whether this patent is obvious.  <u>See</u> 127 S.Ct. at 1740 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious <u>unless</u> its actual application is beyond that person's skill.") (emphasis supplied).

---

[13]This must be the operating assumption for the purposes of summary judgment, but this Court has some doubts.  Many of the inventors in this case do not exclusively work on casino systems.

1

2          **3.   Level of Ordinary Skill in the Art**

3      Plaintiffs expert on invalidity, John Strisower, agrees with

4 Defendants' expert, Dr. Trevor Darrell, that a highlight of the

5 ordinary skill in the art was a knowledge of computing and image

6 processing techniques rather than a mere knowledge of gaming or,

7 for example, the geometry of blackjack tables.  (Strisower Depo.

8 27-28, Ex. 41 to Smith Decl. (#582).)  Defendants assert that

9 Plaintiffs are incorrect in requiring a background in player

10 tracking systems, but note that this Plaintiffs' position actually

11 helps Defendants' case, as the more skill that is present in the

12 art, the more likely it is that the purported innovation would be

13 obvious.  Conversely, Strisower disagrees with Dr. Darrell insofar

14 as Dr. Darrell concludes that one with ordinary skill in the art

15 would have had two years of computer vision or image processing

16 experience.  As Defendants point out, the basis for this

17 disagreement illustrates the nature of the patent:  Strisower

18 claims that in depth image processing experience and knowledge was

19 simply unnecessary because the inventor would only have needed to

20 utilize already developed image processing systems and techniques.

21 (Strisower Depo. 142-43, Ex. D to Pallios Decl. (#873).)

22

23          **4.   Licensing by Others**

24      Licensing by others is a secondary consideration that may be

25 considered in establishing whether a patent is obvious.  Defendant

26 MindPlay attempted to purchase the Trak-21 system, including all

27 existing hardware and Trak-21 systems, contracts and assignments,

28 and intellectual property (copyrights, trademarks, and patents)

1   related to the Trak-21 system for $150,000 in September 2002.  (Ex.
2   17 to Pallios Decl. (#691).)  Strictly speaking, Plaintiffs'
3   assertion that MindPlay attempted to obtain a license is
4   inaccurate, but the attempt to purchase the system could
5   conceivably be indicative of nonobviousness.  In addition, Shuffle
6   Master and IGT have both acquired 50% interests in the patent.

7        Taken on their own, these fact prove very little because there
8   is no evidence in the record as to why Shuffle Master and IGT
9   bought their interests and why Mindplay sought to purchase the
10  Trak-21 system.  See In re Huang, 100 F.3d at 140 (due to the
11  requirement of a "nexus," "success is relevant in the obviousness
12  context only if there is proof that the sales were a direct result
13  of the unique characteristics of the claimed invention – as opposed
14  to other economic and commercial factors unrelated to the quality
15  of the patented subject matter.").

16

17              **5.   Long-Felt but Unmet Need**

18       The existence of long-felt but unmet need to solve a
19  particular problem can also be relevant to obviousness.  The
20  parties are in agreement that, in general, there was a long-felt
21  need for improvements in automated casino monitoring systems.
22  Plaintiffs have not addressed, however, Defendants' contention that
23  Trak-21, the commercial embodiment of the '647 patent, was not a
24  commercial success.  It undisputed that not a single Trak-21 system
25  ever sold.  (Misslin Depo., Ex. S to Darrell Decl. (#870).)

26       The evidence of long-felt need can cut two ways:  On the one
27  hand, long-felt need might be considered evidence of non-
28  obviousness, but on the other hand, to the extent that other

1  factors support obviousness, the existence of "market pressure to

2  solve a problem" can support a finding of obviousness where there

3  are a finite number of possible solutions.  KSR, 127 S.Ct. at 1742.

4  As Defendants argue, there was clearly a motivation to try the

5  limited possibilities for utilizing image processing to track

6  chips.

7       While we are mindful that inferences must benefit the non-

8  moving party, there were very clearly finite solutions towards

9  analyzing the problem, and there is no evidence that the '647

10 patent directly met the long-felt needs of the gaming industry.

11 The Court concludes that the long-felt need for casino surveillance

12 is not indicative of non-obviousness.

13

14                    **6.   Alleged Copying**

15      Plaintiffs make the allegation that Defendants copied the '647

16 patent in creating their own system.  There is no evidence to

17 support this claim, and the claim is controverted by the developers

18 of the MP21 system.  The Federal Circuit has held:

19         Not every competing product that arguably [falls] within the
           scope of a patent is evidence of copying.  Otherwise every
20         infringement suit would automatically confirm the
           nonobviousness of the patent.  Rather, copying requires the
21         replication of a specific product.

22 Iron Grip Barbell Co., Inc. v. USA Sports, Inc., 392 F.3d 1317,

23 1325 (Fed. Cir. 2004) (modified to correct typographical error).  A

24 bare allegation of infringement of a patent is not sufficient to

25 overcome summary judgment on invalidity.

26

27                      **7.   Summary**

28      Identifying the edges of chips stacked on a table is clearly

1   one of a finite number of possibilities for identifying chips on a

2   table through image processing, <u>KSR</u>, 127 S.Ct. at 1742, and the

3   patent itself explicitly states that the image processing

4   techniques applied were "conventional" at the time. '647 patent

5   6:21.  Further, Strisower's testimony indicates that the solution

6   disclosed by the '647 patent was within the technical grasp of the

7   person of ordinary skill in the art.  Defendants argue that

8   Plaintiffs, like the patentee in <u>KSR</u>, "have taken the invention of

9   someone else — image processing techniques — and deprived skilled

10  persons from using those techniques in the casino context."

11  (Def.s' Supp. Points and Authorities re the Effect of <u>KSR</u> on the

12  Parties' Pending Summ. J. Mot.s (#869) 21.)  The Court agrees.

13  While Plaintiffs are correct that image processing is not

14  necessarily the only solution to the problem that Fishbine

15  approached, this does not support the conclusion that Fishbine's

16  utilization of image processing was not obvious in light of the

17  skill in the art.  <u>Id.</u> at 1740.  A development in the area of jet

18  planes is not non-obvious merely because prop planes exist.

19     Because it is undisputed that one with ordinary skill in the

20  art would have a knowledge of image processing, the issue of

21  whether Defendants are entitled to summary judgment is quite close.

22  However, Defendants put substantial reliance on the '187 patent

23  both for the purposes of anticipation and for obviousness.  The

24  scope of that patent and its disclosure is disputed, and we have

25  noted that the patent is also at least arguably vague with respect

26

27

28

43

1   to the means apparently utilized to count chips.[14]  Ultimately, the

2   Court finds that summary judgment cannot be afforded to Defendants

3   in their claim that the '647 patent is obvious because there is a

4   material dispute about the nature and scope of the disclosures in

5   the most relevant prior art.

6

7   **II.  Defendants' Motion for Summary Judgment of Non-Infringement**
    **and Invalidity of U.S. Patent No. 6,313,871 (#566, corrected**

8   **#743)**

9       Oliver Schubert filed his patent application on February 19,

10  1999, and the PTO issued U.S. Patent No. 6,313,871 ('871) on

11  November 6, 2001.  Unlike the '647 patent, the '871 patent does not

12  describe any particular method of image processing.  Instead, the

13  patent deals with the physical layout of a video monitoring system

14  with respect to a gaming table, and the collection of video

15  information related to the game.  The patent has a total of

16  seventy-one claims, with four independent claims (claims 1, 19, 39,

17  and 43).  Claim 1 generally discloses a gaming table, a "volume of

18  space" extending from the upper or lower surface of the table, and

19  a video camera with a line of sight less than about 45 degrees from

20  the upper surface.  Claims 19 and 43 disclose a sensor for

21  activating and deactivating a video camera that collects video

22  information related to the game.  Claim 39 discloses a frame

23  _____

24      [14]Establishing the scope of the '187 patent is at least akin
    to claim construction, but at oral argument both parties submitted
25  that determining the inherent disclosures in that patent was a
    question of fact.  So too is the determination of whether the '187
26  actually enables what it claims, which in turn affects the extent
    to which it is relevant for the purposes of obviousness.  Cf. 35
27  U.S.C. § 112, ¶ 1; Sitrick v. Dreamworks, No. 2007-1174, 2008 U.S.
    App. LEXIS 2251 (Fed. Cir. Feb. 1, 2008, revised Feb. 5, 2008).
28

                                    44

1  coupled to the gaming table, which is capable of housing video

2  cameras under a supported chip tray.

3      Defendants argue that the MP21 does not infringe the '871

4  patent.  Alternatively, Defendants argue that the '871 patent is

5  invalid.  The parties have briefed at length the issues of whether

6  the MP21 system infringes:  (1) the "video camera" and "video

7  information" limitations (all claims); (2) the "sensors sensing

8  predetermined events" limitations (claims 19 and 43, independent

9  claim 44); (3) the "frame" limitations (claim 39); (4) the "imagers

10 in the volume of space" limitation (claim 1); and (5) the focal

11 point "on" the lens limitation (claim 1); and (6) the methods

12 claims(claims 43, 44, and 45).

13     For the reasons set out below, Defendants' invalidity argument

14 is dispositive, and it is not necessary for the Court to address

15 the parties' infringement arguments.  However, the Court has

16 carefully considered all of the parties' numerous arguments, and

17 will briefly note that Defendants would be entitled to partial

18 summary judgment of non-infringement to the extent that the MP21

19 system utilizes a frame rate of 1 frame per 1.1 seconds.  Further,

20 Plaintiffs have failed to meet their burden of production of

21 showing that the system, as currently implemented, utilizes a

22 higher frame rate; indeed, Plaintiffs' counsel has been

23 inconsistent on this issue.  The frame rate is rather obviously not

24 peripheral to the nature of video as a technology, and nothing in

25 the Court's claim construction order would permit a technology that

26 utilizes a series of individually identifiable, non-moving images —

27 at best, analogous to recording a slide show that is apparently

28 never played as such — to be construed as falling within the "video

1  camera" and "video information" limitations of the '871 patent.

2  The relevant frame rate is the rate implemented, not the frame rate

3  that could be implemented in a different system.  Plaintiffs' best

4  argument sounds in the doctrine of equivalents, but the Court

5  agrees with Defendants that the all elements rule, DePuy Spine,

6  Inc. v. Medtronic Sofamor Danek, Inc., 469 F.3d 1005, 1017 (Fed.

7  Cir. 2006), simply cannot allow the distinction between video and

8  non-video cameras to entirely disappear where the patentee chose to

9  use the word video.  The Court will express no other opinion

10 regarding the parties respective infringement arguments.

11

12      **A.   Anticipation**

13      Defendants argue that '871 patent is anticipated by both by

14 the '647 patent and by its embodiment, the Trak-21 system.

15 Defendants assert that the '647 patent discloses "use of video

16 cameras to image chips on a gaming table," which it does.

17 Defendants also assert that the '647 patent discloses a side view

18 of a stack of chips, which it clearly does.  Figure 2 from the '647

19 patent is shown in Appendix B.  Defendants claim that placing

20 cameras in the "volume of space" within the perimeter of the table

21 is inherently disclosed by the angle of the camera, since the line-

22 of-sight would otherwise be obstructed.  Discerning the precise

23 angle of the camera, which is referenced in the '871 patent, is not

24 possible.  Cf. Hockerson-Halberstadt, Inc. v. Avia Group Intern.,

25 Inc., 222 F.3d 951, 956 (Fed. Cir. 2000) (as a matter of claim

26 construction, "patent drawings do not define the precise

27 proportions of the elements").  In any case, nowhere is there any

28 discussion or suggestion in the '647 patent of the perils of remote

46

1   placement.  Defendants' arguments are well taken in the context of

2   obviousness, but there are genuine issues of material fact with

3   respect to Defendants' arguments based on anticipation.

4        Defendants also argue that the first generation of Trak-21,

5   developed by Digital Biometrics, anticipated claims 19 and 43 of

6   the '871 patent.  Claims 19 and 43 require video cameras in

7   "proximity" to the gaming table.  Plaintiffs point out that the

8   cameras in that system were not in the "volume of space" of the

9   gaming table as that term is defined by claim 1.  Defendants do not

10  appear to be arguing that they were.  Plaintiffs also assert that

11  there is no evidence that the first generation of Trak-21 had

12  sensors that sensed activities on the gaming table and activated

13  video cameras.  (Anderson PTO Decl. ¶¶ 4-8, Ex. 4 to Hedman Decl.

14  (#691).)[15]

15       In sum, there are genuine issues of material fact as to

16  whether Trak-21 anticipated the '871 patent.

17

18       **B.   Obviousness**

19       Defendants also argue that the '871 patent is obvious in light

20  of prior art.  The parties appear to agree that the ordinary skill

21  in the art would be the same with this patent as it was with the

22  '647 patent.

23

24

25

26       [15]Defendants argue that the concession that the Trak-21 foot
27  switch is not a sensor is a concession that the touch screen in the
    MP21 system is not a sensor.  However, in any case, Plaintiffs have
28  abandoned the argument that the MP21 touch screen is a sensor.

47

1              **1.    Scope and Nature of the Prior Art**

2         There is no reasonable dispute that all of the individual

3    elements of the '871 patent were known in the prior art.[16]  As the

4    '187 and '647 patents demonstrate, video cameras were used for

5    table monitoring.  As the '647 patent demonstrates, the use of

6    cameras not embedded in the casino ceiling had been disclosed.  So

7    too had the use of cameras to provide a side view of chips on the

8    table.  The use of sensors of various sorts to detect game play had

9    been disclosed by numerous patents.  See U.S. Patents Nos.

10   4,814,589; 5,283,422; 5,586,936; 5,651,548; 5,831,527; 5,735,742.

11   Activating cameras based upon a sensor had been disclosed.  U.S.

12   Patent Nos. 5,651,548, 5,831,527, 5,735,742.  Perhaps the only

13   element of the invention disclosed in the '871 patent that does not

14   appear in the prior art cited by the parties is the "frame," which

15   in any case is only relevant in the patent as a means of locating

16   the camera, and which was also a limitation that Plaintiffs' expert

17   explicitly acknowledged was obvious.  (Strisower Depo. 67-68, Ex.

18   41 to Smith Decl. (#582).)

19        In sum, this is exactly the type of combination patent that

20   KSR discusses.[17]

21

22        _____

23        [16]Plaintiffs object that Defendants have cited U.S. Patent
     Nos. 6,154,131 and 6,165,069, but that those patents are not prior
24   art to the '871 patent.  It is not necessary to consider these
     patents to resolve this motion.

25        [17]When Strisower was asked at his deposition if the
26   combination of elements in the independent claims yielded "any
     unpredictable results" to one skilled in the art at the time,
27   Strisower answered "I can't think of what the unpredictable results
     would be."  (Strisower Depo. 127-130, Ex. D to Roberts Decl.
28   (#873).)

1

2         **2.   Difference Between Prior Art and the Claims at Issue**

3     It is clear that the '871 patent is in substantial part an

4 attempt to patent the position of cameras with respect to the

5 gaming table.  Virtually all of the claims address the positioning

6 of the video camera, and Plaintiffs also place particular emphasis

7 on camera positioning in distinguishing the prior art.  The

8 additional disclosure in the '871 patent is the usage of a sensor

9 to turn cameras on and off, but there is little difference, and

10 certainly no non-obvious difference, between the sensor disclosure

11 in the '871 patent and the prior art.

12     Defendants' observation that the re-positioning of the video

13 cameras in the '871 patent is a thin reed to rely upon for non-

14 obviousness is clearly correct.  First, the '647 patent already

15 made clear that the cameras need not be located in the ceiling.

16 Second, to a large extent, the notion that one moves a camera until

17 one gets the desired view without obstructions is simply common

18 sense.[18]  Hidden cameras were not new, nor were modifications to

19 the chip tray.  Third, Plaintiffs' expert, Dr. Castleman, is

20 notably in agreement with Defendants' conclusion that the

21 positioning of the cameras is obvious.  He frankly stated:

22         as far as what the MP21 System does and how it does it and as
        far as what the claims of the '871 patents describe, I think

23         that the location of the cameras is, in both cases, pretty

24 _____

25     [18]For example, the '871 patent claims numerous angles for the
line of sight of the cameras.  Despite an assault of "asked and

26 answered" objections from Plaintiffs' counsel, Strisower testified
that the '647 patent simply did not need to disclose the angle it

27 used to obtain an image of stacked chips because this could be
obtained through "trial and error."  (Stisower Depo. 100, Ex. D to

28 Roberts Decl. (#873) and Ex. 3 to Hedman Decl. (#862).)

much where they need to be.  It's sort of an obvious proper place to put the cameras for this particular system.

(Castleman Depo. 211, Ex. 15 to Smith Decl. (##582, 604).)  The point was also made by Attila Grauzer, an employee of Shuffle Master, who stated that the location of the cameras "in front of the chip tray . . . was an obvious choice" in connection with Shuffle Master's similar system.  (Grauzer Depo. 77:6-7, Ex. 11 to Smith Decl. (#582).)  Plaintiffs make no substantive argument that the camera position would not have been "obvious to try."  In sum, the problem of avoiding obstacles to the cameras and obtaining a clear picture, insofar as it needed to be addressed by the '647 patent, suggested its own solution.

### 3.  Secondary Considerations

In light of the strong showing of obviousness, the burden is on Plaintiffs to produce evidence of secondary considerations that would rebut the prima facie case.  In re Huang, 100 F.3d at 139. Plaintiffs' rely on the length of time it took to develop Trak-21 and on their allegations that Soltys and Huizinga copied Schubert's invention.

Relying on Strisower's report, Plaintiffs place a great deal of emphasis on the length of time that the developers of the Trak-21 system took in repositioning the cameras in that system.  The role of the length of the design inquiry was addressed in Calmar, Inc. v. Cook Chemical Company, a companion case reported in Graham v. John Deere Company.  383 U.S. at 26-37.  Calmar also dealt with the problem of a combination of prior art, and specifically, it dealt with "a finger-operated sprayer with a 'hold-down' cap of the

type commonly seen on grocers' shelves inserted in bottles of insecticides and other liquids prior to shipment." 383 U.S. at 687. The patentee "stress[ed] the long-felt need in the industry for such a device; the inability of others to produce it; and its commercial success," 383 U.S. at 29, all of which the patentee argued supported non-obviousness. The record supported that there was, in fact, both long-felt need and commercial success and the Court of Appeals "found validity in the 'novel 'marriage' of the sprayer with the insecticide container' which took years in discovery and in 'the immediate commercial success' which it enjoyed." Id. at 30.

The Supreme Court reversed. Addressing contemporary commentary regarding the role of courts in patent cases, the Court essentially concluded that courts should seriously weigh secondary factors but not take their eyes off the ball:

> These legal inferences or subtests [i.e., long-felt need and commercial success] do focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of judicial treatment than are the highly technical facts often present in patent litigation. Such inquiries may lend a helping hand to the judiciary which, as Mr. Justice Frankfurter observed, is most ill-fitted to discharge the technological duties cast upon it by patent legislation. They may also serve to guard against slipping into use of hindsight, and to resist the temptation to read into the prior art the teachings of the invention in issue. [ ¶ ] However, these factors do not, in the circumstances of this case, tip the scales of patentability. The Scoggin invention, as limited by the Patent Office and accepted by Scoggin, rests upon exceedingly small and quite non-technical mechanical differences in a device which was old in the art.

Graham, 383 U.S. at 35-36 (citations and quotations omitted; modification supplied); see also KSR, 127 S.Ct. at 1738, 1745-46 (affirming summary judgment despite the presence of commercial success); Leapfrog, 485 F.3d at 1162 ("substantial evidence of

commercial success, praise, and long-felt need" was inadequate

"given the strength of the prima facie obviousness showing"); <u>Sandt</u>

<u>Technology, Ltd. v. Resco Metal and Plastics Corp.</u>, 264 F.3d 1344,

1355 (Fed. Cir. 2001) (affirming grant of summary judgment where

secondary consideration of commercial success was insufficient in

light of <u>Graham</u> analysis).

As in <u>Calmar</u>, the positioning of the cameras presents a

largely non-technical, and ultimately, small difference between the

patent and the prior art.  If the proximity to the table was not

explicitly disclosed by the '647 patent, this was not a technical

leap.  Similarly, it is clear that one with skill in the art would

use "trial and error," as Strisower puts it, until he or she found

the positioning of the cameras on the table that worked.

Plaintiffs also argue that evidence that the inventors of the

Mindplay patents copied Schubert's innovation is indicative of non-

obviousness.  There are genuine issues of material fact regarding

whether this took place.  However, the purpose of considering

copying as a secondary consideration in the context of obviousness

is not to read the law of trade secrets into patent law.  Rather,

"copying" can in some circumstances be more or less analogous to

commercial success.  It can indicate acclamation and the adoption

of a solution to a problem by an industry.  The problem with

Plaintiffs' theory is that the alleged copying is not probative of

non-obviousness in this case when the prior art is considered in

light of the <u>Graham</u> factors.  <u>Graham</u>, 383 U.S. at 35-36; <u>see</u> <u>In re</u>

<u>GPAC</u>, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("[M]ore than the mere

fact of copying by an accused infringer is needed to make that

action significant to a determination of the obviousness issue.");

1  see also Ecolochem, Inc. v. Southern California Edison Co., 227

2  F.3d 1361, 1380 (Fed. Cir. 2000).

3

4      **4.   Summary**

5      The Supreme Court's broadest teaching in KSR is directly on

6  point and must be emphasized:

7      We build and create by bringing to the tangible and palpable
       reality around us new works based on instinct, simple logic,
8      ordinary inferences, extraordinary ideas, and sometimes even
       genius.  These advances, once part of our shared knowledge,
9      define a new threshold from which innovation starts once more.
       And as progress beginning from higher levels of achievement is
10     expected in the normal course, the results of ordinary
       innovation are not the subject of exclusive rights under the
11     patent laws.  Were it otherwise patents might stifle, rather
       than promote, the progress of useful arts.  See U.S. Const.,
12     Art. I, § 8, cl. 8.

13  KSR, 127 S.Ct. at 1746 (emphasis supplied).  In light of the '187

14  patent and the disclosure in the '647 patent disclosed that stacks

15  of chips could be analyzed from the side, the remaining work could

16  not reasonably be considered anything beyond "ordinary innovation,"

17  and to find otherwise would be to render the person with ordinary

18  skill in the art an automaton.  Accordingly, summary judgment must

19  be granted to Defendants on the issue of the invalidity of the '871

20  patent.  The parties' cross-motions dealing with the failure to

21  Join William Florschuetz as a co-inventor (##575, 672) will be

22  denied as moot.

23

24  **V.   Plaintiff Shuffle Master's Motion for Summary Judgment of
        Invalidity of the Asserted Claims of U.S. Patent Nos.
25      6,517,436 and 6,520,857 (#577) and Defendants' Motion for
        Summary Judgment of Plaintiffs' Counts I-III of Counterclaims
26      for Interference (#572)**

27      In their counterclaims to Defendants' counterclaims for

28  infringement, Plaintiffs allege that three patents owned by

53

1   MindPlay — U.S. Patent Nos. 6,517,436 ('436), 6,520,857 ('857),
2   6,530,836 ('836) — interfere with the '871 patent.  (P.s' Fourth
3   Amended Reply to D.s' Counterclaims to First Amended Complaint for
4   Patent Infringement and Affirmative Defenses and Counterclaims in
5   Reply Thereto (#556).)  Plaintiffs' motion for summary judgment
6   asserts that summary judgment should be granted with respect to the
7   '436 and '857 patent.  Specifically, Plaintiffs seek summary
8   judgment that claims 1, 2, 5, 8, 9 and 15 of the '436 patent, and
9   claims 1 through 3, 11, and 14 of the '857 patent interfere with
10  claims 5, 6, 39, and 67 of the '871 patent, and that the '871
11  patent has the earlier priority date.

12      Defendants' motion for summary judgment, on the other hand,
13  seeks summary judgment that there is no interference with any of
14  the three MindPlay patents.  Defendants' motion flows entirely from
15  evidentiary objections, and the assertion that there is "no
16  evidence" to support Plaintiffs' claims.  Notwithstanding
17  Defendants' proper evidentiary objection with respect to Carmichael
18  and the conclusory nature of Strisower's expert opinion on the
19  issue of interference, it is simply cavalier to assert that there
20  is "no evidence" of interference.  The patents themselves are
21  constitute the most probative evidence regarding interference in
22  this case.  See Avia Group Intern., Inc. v. L.A. Gear California,
23  Inc., 853 F.2d 1557, 1562 (Fed. Cir. 1988) ("a judge may decide the
24  legal issue of validity unaided by expert opinion").  In any case,
25  because the '871 patent is invalid, the motions for summary
26  judgment based on the interference claims are moot.

27      Although the interference claims are moot, Plaintiffs' motion
28  also seeks summary judgment that the '871 patent and the third

54

generation of the Trak-21 system, developed as a joint venture
between Digital Biometrix and Lakes Gaming, anticipates the same
two MindPlay patents ('436 and '857).  In their supplemental
briefing related to the effects of KSR on this case, Plaintiffs
more broadly argue that the '436 and '857 patents are obvious.

     The '436 and '857 patents stem, as do several other related
patents, from the same provisional application.  Generally, the
disclosure in the specification of these patents is of a
comprehensive system for monitoring playing and wagering.  The
components disclosed in the specification are, broadly, a card deck
reader, a chip tray reader, a table monitoring system, an automatic
drop box that verifies the amount and authenticity of deposits, and
an automated computer system that uses the other components to
"monitor the habits of players and the performance of employees."
'436 and '857 Patents 2:16-61.  The claims in the '436 and '857
system pertain only to the table monitoring system.  The embodiment
of this system disclosed in the specification utilizes nine CMOS
sensors, like the sensors in the MP21 system, which are positioned
in the chip tray to monitor both the chips and cards at play on the
table.  Id. at 9:30-10:13.

     Plaintiffs' invalidity argument relies in part on Plaintiffs'
contention that the Trak-21 system and the '871 patent are prior
art to the '436 and '857 patents.  The applications were co-
pending, but the '871 patent application was the first filed.  The
parties dispute whether Plaintiffs have met their burden of showing
that '871 patent is prior art under section 102(g)(2) to the '436
and '857 patents.  Similarly, the parties dispute whether
Plaintiffs have met their burden of showing the Trak-21 system is

1  prior art to the '871 system.

2       As summarized by Professor Chisum:

3       The junior party bears the burden of going forward with
        evidence as to actual reduction to practice prior to the
4       senior party's filing date or conception prior to the senior
        party's filing date plus continuous and reasonable diligence
5       during the critical period.  If the senior party desires to
        show a date of conception or reduction to practice prior to
6       his filing date, he bears the burden of going forward with
        evidence. . . .  The ultimate burden of persuasion remains on
7       the junior party or parties in an interference as to all
        issues of fact relevant to priority of conception and
8       reduction to practice.

9  3A-10 Donald Chisum, Chisum on Patents § 10.09 (2006).  The '871

10 patent application was the first filed, and the Court could easily

11 find on this record that Defendants have failed to meet their

12 burden of producing evidence of a priority date earlier than the

13 filing date for the '436 and '857 patents.  However, Plaintiffs

14 have accepted, at least for the purposes of summary judgment,

15 Defendants' interrogatory response stating that the conception of

16 the '436 and '857 patents was from "August 1998 to January 1999."

17 (Ex. F to Bregenzer Decl. (#583).)

18      In arguing that the conception of the '871 patent precedes

19 August 1998, Plaintiffs first rely upon this Court's Order (#534)

20 of July 17, 2006, which granted partial summary judgment "that

21 Robert Mouchou received Schubert's putative trade secrets during

22 his negotiations with Schubert."  The key events with respect to

23 Mouchou and Schubert's interactions were a demonstration that

24 occurred in August 1997 and a joint venture proposal that Schubert

25 faxed to Mouchou in July 1997.  Trade secrets were revealed to

26 Mouchou, but there are genuine issues of material fact regarding

27 what occurred at this meeting.  It was not the intention of the

28 Court to make any factual finding regarding "Appendix A" to

1   Plaintiffs' motion (P.s' Mot. for Partial Summ. J. (#319)), which

2   was, of course, not a document that was exchanged between Schubert

3   and Mouchou.  The Court now clarifies that purported trade secrets

4   were disclosed, but that the Court did not find that the substance

5   of the '871 patent had been disclosed in its entirety to Mouchou.

6   As Defendants note, Plaintiffs had affirmatively argued that this

7   could not have been the case,[19] and Mouchou stated that the system

8   that Schubert had demonstrated was "vapor ware."  The Court's Order

9   (#534) of July 17, 2006 does not establish the date of conception

10  of the '871 patent.

11      Turning then to the evidence that was before the PTO and is

12  now before the Court, Schubert's affidavit appeared to claim a

13  conception and priority date as early as 1995.  (Ex. H to Bregenzer

14  Decl. (#583).)  In light of the contents of Schubert's earliest

15  emails to Florschuetz in 1995, this claim to the PTO was nothing

16  short of far-fetched.  Further, the redactions of the dates from

17  the emails between Schubert and Florschuetz facially suggests an

18  attempt to deceive the PTO regarding the actual timeline of

19  conception and reduction to practice.  Nevertheless, the unredacted

20  correspondence makes it quite clear that Schubert had conceived of

21  placing the cameras in the front of a modified chip tray by

22  February 3, 1997.  (Ex. Q to Bregenzer Decl. (#583).)  Defendants

23  

24      [19]Plaintiffs argued at some length in opposing Defendants' "on
25  sale bar" summary judgment motion both that the prototype that had
    been demonstrated "lacked many of the limitations that
26  characterizes the claimed invention," and further, that "*many of
    the concepts claimed in the '871 patent were not even conceived
27  until after the July 1997 demonstration*."  (P.s' Opp. to Def.s'
    Mot. for Summ. J. of Invalidity of U.S. Patent No. 6,313,871 (#318)
28  8) (emphasis supplied).

1  also assert that there are issues of fact surrounding Schubert's

2  diligence.  The "basic inquiry" with respect to diligence is

3  "whether there was reasonably continuing activity to reduce the

4  invention to practice."  Brown v. Barbacid, 436 F.3d 1376, 1380

5  (Fed. Cir. 2006).  In light of the email correspondence submitted

6  to the PTO and Schubert's subsequent preparation of his patent

7  application, both Schubert and Florschuetz's continuity of work on

8  the invention and the relevant landmarks in that work have been

9  established.  See 3A-10 Chisum on Patents § 10.07 & n.4 ("diligence

10  is a stringent standard" and "[e]vidence which is of a general

11  nature to the effect that work was continuous and which has little

12  specificity as to dates and facts does not constitute the kind of

13  evidence required to establish diligence in the critical period.")

14  (quoting Hunter v. Beissbarth, 230 USPQ 365, 368 (Bd. Pat. App. &

15  Int'f 1986)).  The Court thus finds that Schubert's diligence is

16  beyond reasonable dispute.

17      We will briefly note that the issue of whether Trak-21 can be

18  considered prior art to the '436 and '857 patents involves genuine

19  issues of material fact.  Anderson's declaration states that

20  Anderson worked for Digital Biometrics, that he hired Bryant

21  Scheffe as a consultant in December 1997 or January 1998, and that

22  Scheffe had the idea of placing cameras in the chip tray within a

23  few months.  (Anderson PTO Decl. ¶ 15, Ex. D to Hedman Decl.

24  (#584).)  The corroborating slides from two presentations, which

25  are attached to Anderson's PTO declaration as "tab 13," "tab 14,"

26  and "tab 15", show that the invention was certainly conceived by

27  July 7, 1998.  Presentation slides, dated August 26, 1998, also

28  indicate that a "rapid prototype system" was complete "minus the

chip tray cover" on August 25, 1998.  Yet the system was not made
public until April 29, 1999.  Thus, while there may not be genuine
issues of fact with respect to conception and reduction to
practice, there are issues of fact with respect to whether the
invention was suppressed or concealed.  <u>See</u> 35 U.S.C. 102(g)(2);
<u>Kimberly-Clark Corp. v. Johnson & Johnson</u>, 745 F.2d 1437, 1446
(Fed. Cir. 1984).

Ultimately, however, the issue of the priority dates of the
'871 patent and the Trak-21 system are not material, because the
'871 and the '436 and '857 patents cover virtually the same ground
as the '871 patent.  As Plaintiffs point out, Defendants offer no
expert evidence to support the validity of their patents.  They
challenge the status of the '871 patent and the Trak-21 system as
prior art, but decline to state any other substantive reasons why
the '436 and '857 patents are not obvious.  Not without reason,
Defendants instead argue that Plaintiffs' arguments in support of
the obviousness of the '436 and '857 patents exposes the weakness
of Plaintiffs' opposition to Defendants' motion for summary
judgment that the '871 patent is obvious.  The observation is well
taken.[20]  However, these observations do not address the issue of
the obviousness of the '436 and '857 patents.

Plaintiffs' Appendices C and D to their motion (#577) set out
with particularity why claims 1, 2, 5, 8, 9 and 15 of the '436

---

[20]Plaintiffs cite patents as prior art that they contend
render the '436 and '857 patent obvious, even as they resist having
these same patents cited as prior art for the '871 patent, and they
further argue that moving the camera to avoid obstructions was
obvious.  (P.s' Supp. Points and Authorities Re Obviousness and the
Impact of the Supreme Court's KSR Decision on the Pending Summ. J.
Mot.s (#859) 8.)

59

1 patent, and claims 1 through 3, 11, and 14 of the '857 patent are
2 obvious in light of the '871 patent.  These claims are also obvious
3 in light of the Fishbine, French, Storch, Uhland, and to some
4 extent Greenwood patents, and for substantially the same reasons
5 that the '871 patent is obvious.  Summary judgment will be granted
6 to Plaintiffs with respect to the invalidity of the asserted
7 claims.

8

9  **IV.  Defendants' Motion for Summary Judgment on Shuffle Master's**
   **Claim for Correction of Inventorship in Counts III through IX**
10 **of the First Amended Complaint (#578)**

11      In counts III through IX of the First Amended Complaint,
12 Plaintiffs assert that Oliver Schubert is a true but unnamed
13 inventor of seven patents owned by MindPlay: U.S. Patents
14 6,517,436; 6,520,857; 6,527,271; 6,530,836; 6,712,696; 6,579,180;
15 6,579,181.  Defendants seek summary judgment on these counts,
16 arguing (1) that there is insufficient evidence that Richard Soltys
17 and Rick Huizinga received any of Schuberts' ideas, and (2) that
18 Schubert's alleged contribution is prior art and prior art cannot
19 be a basis for inventorship.  Soltys and Huizinga are the named
20 inventors on these patents, and the patents are assigned to
21 MindPlay.  Schubert is a former employee of Shuffle Master and the
22 named inventor of the '871 patent.  It is undisputed that there was
23 never any direct communication between Schubert and the named
24 inventors, Soltys and Huizinga.  However, tracking Plaintiffs'
25 earlier trade secrets theory, Plaintiffs assert that Soltys
26 received Schubert's ideas from Robert Mouchou, an executive
27 employee of the Eldorado casino, and incorporated these ideas into
28 the MindPlay patents.

1     Plaintiffs theory is as follows:  (1) Mouchou approached

2 Schubert about the possibility of a joint venture to produce a

3 table tracking system in October 1996 (which appears to be

4 undisputed); (2) Mouchou and his boss, Gene Carano, travelled to

5 Las Vegas on July 23, 1997 to observe a demonstration of Schubert's

6 prototype (which appears to be undisputed); (3) through this

7 demonstration, which was confidential and made in furtherance of

8 the proposed joint venture, Mouchou obtained Schubert's

9 confidential ideas for future improvements regarding the

10 development of a table monitoring system, including the idea of

11 putting cameras inside the chip tray; and (4) Mouchou began to work

12 with MindPlay on the company's table system and conveyed Schubert's

13 confidential ideas to Soltys.

14     The Court finds that there are genuine issues of material fact

15 regarding whether any of Schubert's ideas found their way to

16 Soltys.  The Court, however, agrees with Defendants that Schubert's

17 alleged contribution could not have been enough to render him a co-

18 inventor of the MindPlay patents.  First, the '871 patent is

19 obvious.  Second, the Federal Circuit has held that "[o]ne who

20 simply provides the inventor with well-known principles or explains

21 the state of the art without ever having 'a firm and definite idea'

22 of the claimed combination as a whole does not qualify as a joint

23 inventor." Ethicon, Inc. v. United States Surgical Corp., 135 F.3d

24 1456, 1460 (Fed Cir. 1998); see also Pannu v. IOLAB Corp., 155 F.3d

25 1344, 1351 (Fed. Cir. 1998).

26     Plaintiffs seek to distinguish Ethicon as inapplicable in

27 situations where, as is approximately alleged here, an inventor

28 keeps information secret and then shares it with another inventor.

1  To the extent that the '871 patent is prior art to the MindPlay

2  patents, the issue of misappropriation is simply a distraction

3  because the Court must presume that each of the patents was granted

4  for innovations beyond what the '871 patent already disclosed.  In

5  order to prevail with their correction of inventorship argument,

6  Plaintiffs would have to show that Schubert contributed something

7  beyond what the '871 patent already disclosed, and this Plaintiffs

8  have not even attempted.  Conversely, as Defendants argue, the

9  patent examiner must be presumed to have allowed the patent in

10 spite of the '871 patent, not because of it.  Accordingly, if

11 Schubert prevailed, it would only show that some or all of the

12 MindPlay patent claims are invalid in light of the '871 patent, not

13 that inventorship should be corrected.

14

15

16 **V.   Conclusion**

17      For the reasons set forth above, **IT IS HEREBY ORDERED** that:

18      1.   The Court's rulings on the evidentiary issues raised by

19           the parties are as set forth above.

20      2.   Plaintiffs' Motion to Strike [886] Errata (#891) and

21           Plaintiffs' Motion for Leave to File Responses (#885) are

22           **DENIED**.  Defendants' Motion (#824) to Strike the

23           Supplemental Expert Report of James T. Carmichael and the

24           Portions of the Supplemental Expert Report of John

25           Strisower Addressing Plaintiffs' Interference Claim for

26           Violation of the Court's June 14, 2007 Order is **DENIED** as

27           to Strisower but **GRANTED** as to Carmichael.

28      3.   The Court's claim construction Order (#322) is **AMENDED** as

1  follows: The terms "chip edges" and "edges of each chip
2  and edges of each individual chip" in the '647 patent
3  shall both be construed as "the transition between a chip
4  and something that is not that chip."
5  4.  Defendants' Motion for Summary Judgment of
6  Non-Infringement and Invalidity 5,781,647 (#580, #742) is
7  **GRANTED** with respect to non-infringement and **DENIED** with
8  respect to invalidity.
9  5.  Defendants' Motion for Summary Judgment of
10  Non-Infringement and Invalidity of U.S. Patent No.
11  6,313,871 (#566, #743) is **GRANTED** on the issue of
12  invalidity.
13  6.  Defendants' Motion for Summary Judgment of Invalidity of
14  U.S. Patent No. 6,313,871 Due to Failure to Join Co-
15  Inventor William Florschuetz (#575) and Plaintiffs' Cross
16  Motion for Summary Judgment (set forth in Plaintiffs'
17  Opposition to Defendants' [Seventh] Motion for Summary
18  Judgment of Invalidity of U.S. Patent No. 6,313,871 Due
19  to Failure to Joint Co-Inventor William Florschuetz)
20  (#672) are both **DENIED** as moot.
21  7.  Defendants' Motion for Summary Judgment on Plaintiffs'
22  Counts I-III of Counterclaims for Interference (#572) is
23  **DENIED** as both meritless and moot.
24  8.  Plaintiff Shuffle Master's Motion for Summary Judgment of
25  Invalidity of the Asserted Claims of U.S. Patent Nos.
26  6,517,436 and 6,520,857 (#577) is **GRANTED**; claims 1, 2,
27  5, 8, 9 and 15 of the '436 patent, and claims 1 through
28  3, 11, and 14 of the '857 patent are obvious.

1       9.    Defendants' Motion for Summary Judgment on Shuffle

2           Master's Claim for Correction of Inventorship in Counts

3           III through IX of the First Amended Complaint (#578) is

4           **GRANTED**.

5

6  DATED: March   21  , 2008 .

7                             UNITED STATES DISTRICT JUDGE

## APPENDIX A



(Darrell Decl. (#569) ¶ 80) (arrows in original).



(Darrell Decl. (#569) ¶ 81) (representing three stacked chips).

(Darrell Decl. (#569) ¶ 82) (omitting both horizontal and vertical edges).

**<u>Appendix B</u>**



Figure 2, U.S. Patent No. 5,781,647